184 N.J. Super. 282 (1981)
445 A.2d 1174
HISTORIC SMITHVILLE DEVELOPMENT CO., A NEW JERSEY GENERAL PARTNERSHIP, PLAINTIFF,
v.
CHELSEA TITLE & GUARANTY COMPANY, A NEW JERSEY CORPORATION, DEFENDANT.
Superior Court of New Jersey, Chancery Division Atlantic County.
Decided February 19, 1981.
*284 David M. McCann for plaintiff (Carpenter, Bennett & Morrissey, attorneys).
Irwin I. Kimmelman for defendant (Kimmelman, Wolff & Samson, attorneys).
HAINES, J.S.C.
Historic Smithville Inns, Inc. ("Inns"), a Delaware corporation, owned 2,300 acres of partly improved land in Galloway Township, Atlantic County, New Jersey. Title to the real property was insured by Chelsea Title & Guaranty Company in August 1974. In November 1977 the New Jersey Attorney General commenced a suit entitled Hyland v. Burgess, in which the titles to numerous tracts of land in Burlington and Atlantic Counties were challenged on claims of fraud. Approximately 300 acres of the Inns' property were involved in the suit, which has not yet been tried. At the Inns' request, Chelsea authorized a firm of attorneys to defend its title at Chelsea's expense, as required by its title insurance policy. Fees to date, some of which are in dispute, have exceeded $200,000.
Historic Smithville Inns, Inc. was a wholly-owned subsidiary of ABC Leisure Attractions, Inc. ("ABC Leisure"), which, in turn, was wholly owned by the American Broadcasting Companies, Inc. ("ABC"). In 1978 ABC commenced negotiations for the sale of Inns to a group of prospective purchasers ultimately known as Historic Smithville Development Co., a partnership. The purchaser preferred to acquire the assets of Inns, as opposed to its stock. ABC, however, was insistent upon a stock transaction. The Development Company, attracted by a reduction in the purchase price from $17,000,000 to $15,000,000, eventually agreed to purchase all of Inns' stock. The price reduction was granted because of real-property title problems and to *285 offset tax costs to the buyer relating to the proposed liquidation of Inns after the transfer of its stock. The sales agreement relieved ABC of any responsibility for the quality of the real estate titles held by Inns. The purchaser was aware of the title problems caused by the proceedings in Hyland v. Burgess; an additional consideration which encouraged the stock purchase was its belief that Chelsea's title policy would remain in force after the transaction had been completed.
The Inns' stock was sold to the Development Company under an escrow arrangement in April 1979 and released from escrow on May 14, 1979. On the latter date the purchaser adopted a liquidation plan calling for the dissolution of Inns and the transfer of all of that corporation's assets to itself, thereby permitting the partners of the Development Company to enjoy certain tax advantages. Title to the real property was transferred to the partnership by deed.
Shortly after the events of May 14, 1979 Chelsea took the position that the purchasing partnership was not insured under its policy and was not entitled to have the Hyland v. Burgess litigation further defended by Chelsea. This suit ensued. Among other things, it seeks to compel Chelsea to supply the refused defense. This opinion responds to plaintiff's order to show cause and Chelsea's cross-motion, both seeking a declaration of the Development Company's rights under the title policy. The facts are not in dispute and the issues may now be decided as a matter of law. Judson v. Peoples, etc., 17 N.J. 67 (1954).

The Title Insurance Policy
Chelsea's policy of title insurance describes the "insured" thereunder in the following language:
... the insured named in Schedule A, and, subject to any rights or defenses the company may have against the named insured, those who succeed to the interest of such insured by operation of law as distinguished from purchase including, but not limited to, heirs, distributees, devisees, survivors, personal representatives, next of kin, or corporate or fiduciary successors.
*286 It later provides that "this policy shall not continue in force in favor of any purchaser from such insured...." The Development Company claims to be an insured within this definition. Chelsea contends that it is not.

By Operation of Law
The Inns was a Delaware corporation, dissolved in accordance with the requirements of Delaware law. 8 Del.Code § 275, authorizes dissolution by resolution of corporate directors and shareholders, followed by the filing of a certificate of dissolution in the office of the Secretary of State. The Code, § 278, also continues the existence of dissolved corporations for three years, "for the purpose of ... enabling them gradually to settle and close their business, to dispose of and convey their property...." The conveyance of the real property owned by Inns to the Development Company was made pursuant to this statute and the plan of liquidation.
Chelsea claims that this transaction made plaintiff a "purchaser" from its insured, expressly excluded from coverage by the language of its policy, since it did not acquire title by operation of law. It defines the phrase "by operation of law" to refer only to those transfers of title which are automatic or involuntary, which require no discretionary action on the part of any owner of real property. Pioneer Nat'l Title Ins. Co. v. Child, Inc., 401 A.2d 68 (Del.Sup.Ct. 1979), provides support for the argument; it held:
"Operation of law" is a generic term or phrase commonly used to express the manner in which rights (and/or liabilities) attach to a person by the mere application to the particular transaction of the established rules of law, without the act or cooperation of that person. Black's Law Dictionary (4 ed.)
A somewhat more practical statement of its meaning appears in 67 C.J.S. at page 877:
"Operation of law. The obligation of law, its practical working and effect. It is a term applied to indicate the manner in which a party acquires rights without any act of his own. In its usual signification, `operation of law' is generally applicable to matters involving title and refers to situations in which rights, and sometimes liabilities, are created without action by the parties."

*287 In "practical working and effect," the term indicates the manner in which a person acquires rights without any act of his own. [Citation omitted.] And the "operation" or impact of the law upon the particular transaction, [footnote omitted] without more, is to be contrasted with events caused by the voluntary action of the parties. In the latter case, the result is not caused by operation of law. [Citation omitted.] Apart from statute or other special circumstance, one's voluntary act cannot create or enlarge one's rights by imposing liability on or enlarging the liability of another. [at 70-71]
In United States v. Seattle-First Nat'l Bank, 321 U.S. 583, 64 S.Ct. 713, 88 L.Ed. 944 (1944), the court said:
... We must look only to the immediate mechanism by which the transfer is made effective. If that mechanism is entirely statutory, effecting an automatic transfer without any voluntary action by the parties, then the transfer may be truly said to be "wholly by operation of law." [at 587-588, 64 S.Ct. at 715-716]
It therefore held that the transfer of securities from a state bank to a consolidated bank occurred automatically by reason of the consolidation and was therefore "by operation of law."
It is Chelsea's contention that the transfer in liquidation to Historic Smithville Development Co. was voluntary, that the execution and delivery of the deed of conveyance was a discretionary act. The argument rests upon the fact that the Delaware statute does not provide for an automatic transfer of assets upon the dissolution of a corporation; on the contrary, action by the board of directors is necessary. In the present case, except for the plan of liquidation, the directors of Inns controlled the disposition of its assets and were not obliged to convey the real property to its only stockholder. It is said, therefore, that the requirements of transfer "by operation of law" have not been satisfied.
In Kay Furniture Co. v. Rovin, 312 Mich. 290, 20 N.W.2d 194, 195 (Sup.Ct. 1945), the court dealt with a Michigan statute very close in language to the Delaware statute. It continued corporate existence for three years after dissolution to permit the disposition of property. In Kay all of the assets of the dissolved corporation except a lease were transferred to its sole shareholder. The question was whether the lease was controlled after dissolution by that shareholder or by the corporation. The court held that control continued in the corporation, by reason of the statutory requirement.
*288 No case has been brought to the court's attention which defines the term "operation of law" in a setting involving a corporate dissolution and its effect upon title insurance coverage. Pioneer, supra, for example, is the only case approaching the present problem, but it does so in the context of intercorporate transfers. It does not decide dissolution questions. Cases dealing with tax problems and control over assets which have not been transferred by the directors of a dissolved corporation offer logical parallels but are clearly distinguishable, since they do not address the interpretation of insurance policies, when interpretation is required, or employ any of the rules which affect that undertaking. The language of Chelsea's policy is not clear; it requires interpretation. In pursuing that task, the court must observe the rule that "in such policies the phraseology must be liberally construed in favor of the insured and strictly construed against the insurer." Sandler v. N.J. Realty Title Ins. Co., 36 N.J. 471, 478-479 (1962). The Sandler court also said that purchasers of title insurance policies "should not be subjected to technical encumbrances or to hidden pitfalls and their policies should be construed liberally in their favor to the end that coverage is afforded `to the full extent that any fair interpretation will allow.'" Further, when interpretation is required, a "reasonable expectation" principle may be applied, i.e., the policy may be interpreted to reflect the reasonable expectations of the purchaser. In DiOrio v. New Jersey Mfrs. Ins. Co., 79 N.J. 257 (1979), our Supreme Court said:
Recognizing the position of laymen with respect to insurance policies prepared and marketed by the insurer, our courts have endorsed the principle of giving effect to the "reasonable expectations" of the insured for the purpose of rendering a "fair interpretation" of the boundaries of insurance coverage. Kievit v. Loyal Protective Life Insurance Co., 34 N.J. 475, 482-83 (1960). Thus, the insured's "reasonable expectations" are brought to bear on misleading terms and conditions of insurance contracts and genuine ambiguities are resolved against the insurer.... In applying this principle, an objectively reasonable interpretation of the average policyholder is accepted so far as the language of the insurance contract in question will permit. [at 269; citations omitted]
Chelsea's policy covers not only the named insured but also "those who succeed to the interest of such insured by *289 operation of law as distinguished from purchase...." A strict interpretation of the words "by operation of law," favored by Chelsea, would limit coverage to those who acquire title on an entirely involuntary basis, e.g., a surviving tenant in a joint tenancy of real property. Also clearly included as involuntary transferees would be heirs and next of kin who acquire title as the result of death and not as the result of an agreement or a will. They are specifically mentioned in the policy. Does one who succeeds to the named insured's title by virtue of a corporate dissolution acquire title "by operation of law"? Chelsea argues that the transfer is voluntary and therefore does not meet the proper definition of that language. That language, however, must be read much more broadly than Chelsea suggests; it must be construed liberally, not strictly. It does not limit the terms "insured" and "operation of law" to strictly involuntary transferees. In several instances it includes in its definition of "insured" those who acquire title through some voluntary action. For example, "devisees" are covered. A "devisee" is one who acquires title to real property by will, Kayhart v. Whitehead, 77 N.J. Eq. 12 (Ch. 1910), and therefore by the voluntary act of the testator. The devise is not effective until the will is probated, a voluntary action very similar to the delivery and recording of a deed in the execution of a liquidation plan by the directors of a dissolved corporation. A devise may be subject to a power of sale. When the power is released by a deed from the executor it does not make the grantee any less a devisee, although it relinquishes control in the same way as a deed in dissolution. In 13 N.J. Practice (Lieberman, Abstracts and Titles), § 123, a devise is described as a "purchase." The policy here expressly excludes "purchasers" from coverage, while expressly including devisees. Under usual rules of construction the specific term "devisees" would prevail over the general term "purchaser." Ohio Cas. Ins. Co. v. Flanagin, 44 N.J. 504 (1965). Further, application of the rule of liberal construction to this contradictory language produces the obvious conclusion that devisees are covered. Thus, Chelsea does not *290 exclude all "purchasers" from its definition of "insured." The policy also extends coverage to "distributees." The word is very broad. It may include persons to whom real property is distributed by an executor, a possible discretionary act, and those to whom a corporation in the process of dissolution distributes its real estate. The policy does not limit the term. A "fiduciary successor" is described as an "insured." There are many fiduciary relationships. Partners stand in a fiduciary relationship to each other. A new partner who is substituted for another may be a "fiduciary successor." If so, the substitution, though not in any sense "by operation of law," would not disturb coverage even though a 99% interest in the partnership assets changed hands. "Corporate successors" are covered. This is loose language. It would seem to encompass all who step into the shoes of the corporation, who become its "successors." Thus, if a corporation, in dissolution or otherwise, transfers all of its assets to some other entity or to an individual, the transferee is a "successor" in every sense of the word.
Some jurisdictions have decided that assets, including real property, owned by a corporation which is dissolved, passes by operation of law to its shareholders. Levy v. Liebling, 238 F.2d 505 (7 Cir.1956), cert. den. 353 U.S. 936, 77 S.Ct. 812, 1 L.Ed.2d 759 (1957); Baehr Bros. v. Commonwealth, 487 Pa. 233, 409 A.2d 326 (Sup.Ct. 1979); Ban-Mac, Inc. v. King Cty., 69 Wash.2d 49, 416 P.2d 694 (Sup.Ct. 1966); Kirby Royalties, Inc. v. Texaco, 461 P.2d 282 (Wyo.Sup.Ct. 1969). These cases do not deal with title insurance or the Delaware statute. Nevertheless, they illustrate an interpretation of the phrase "operation of law" in a dissolution setting. They permit the suggestion that transfers in dissolution, pursuant to a statute, in cases where, as here, there are no creditor problems, are the perfunctory discharge of a legal obligation to invest shareholders with assets to which they are entitled. Such action is required by law and may therefore be said to be "by operation of law." Commonwealth v. Passell, 422 Pa. 473, 223 A.2d 24, 29 (Sup.Ct. 1966), provides a helpful *291 view of the effect of a conveyance from the dissolved corporation to its shareholder:
The only purpose of the deed in a corporate liquidation and dissolution is simply to place on record information regarding the transfer much in the same way that articles of merger provide such information in the case of a corporate merger. [at 481]
This is the plaintiff's position: it would treat the deed here as merely confirmatory.
Truly automatic transfers of title to real property occur only by survivorship in a joint tenancy and through intestate succession. The comment of the United States Supreme Court in United States v. Seattle-First National Bank, supra, while dictum, is apropos:
... But in a broad sense, few if any transfers ever take place "wholly by operation of law," for every transfer must necessarily be a part of a chain of human events, rarely if ever other than voluntary in character. [321 U.S. at 587-588, 64 S.Ct. at 715-716]
Lieberman, supra, describes the acquisition of title by "escheat, occupancy, accretion, forfeiture, abandonment, eminent domain, estoppel, adverse possession, deed and devise," as purchases. Stabel v. Gertel, 111 N.J.L. 296, 297 (E. & A. 1938), and Berger v. U.S. Steel Corp., 63 N.J. Eq. 809, 817 (E. & A. 1962), state that lands are "purchased" whenever they are acquired by any means other than descent or inheritance.
Chelsea, claiming that transfers by corporations in dissolution are not voluntary, points to corporate mergers by way of contrast. As to the latter, 8 Del.Code § 269, provides that when a merger or consolidation becomes effective, "all property, real, personal and mixed, ... shall be vested in the corporation surviving or resulting from such merger or consolidation...." It is said, therefore, that a merger effects an involuntary transfer of title. This overlooks the fact that mergers are accomplished by voluntary agreement. Property may be included in the merger, or excluded and conveyed away  a discretionary decision. Little difference can be found between this circumstance and the action of a corporation which adopts a plan of liquidation, pursuant to which it is dissolved, and then conveys *292 its property. The moment the dissolution becomes effective its property must be transferred in accordance with the plan of liquidation.[1] The directors of a dissolved corporation have a fiduciary relationship with its shareholders and creditors. They must use the corporate assets first to pay creditors (as to which there is here no concern) and then in the interest of shareholders. Wilmington & R.R. Co. v. Downward, 8 Del. 277 (1 Houst.), 14 A. 720 (Err. & App. 1888), 32 A. 133 (Err. & App. 1888) (concurring opinion). They are bound to perform the terms of the liquidation contract. Thus, in Addy v. Short, 47 Del. 157, 89 A.2d 136, 139 (Sup.Ct. 1952), the court stated that upon dissolution corporate property is to be "administered in Chancery for the purpose of winding up the corporate affairs and distributing the assets to those equitably entitled to them." It also held that the directors were to be treated as common-law trustees. Shareholders to whom title to assets must pass under the terms of a liquidation plan are "equitably entitled" to them. They could obtain title in a specific performance action. In the eyes of this court they are the true owners of the assets because equity treats as done that which ought to be done. Furthermore, after dissolution the powers of a corporation are limited: it may conduct only such business as is "incidental and necessary to the delegated power to wind up." McBride v. Murphy, 14 Del. Ch. 242, 249, 124 A. 798, 801 (Ch. 1924), aff'd 14 Del. Ch. 457, 130 A. 283 (Sup.Ct. 1925). One "necessary" action is performance of the plan of liquidation, the terms of which cannot be ignored. Realistically, therefore, the transfer of title in a dissolution proceeding is no less involuntary than the transfer in a merger proceeding. The deed of conveyance is merely a formality; it is not a distinguishing characteristic.
*293 Finally, Chelsea admits that a liquidation of Inns followed by the transfer of the property to ABC would not eliminate coverage. It must take this position because it relies on an alternative argument, considered below, that the court is bound to recognize substance over form, in connection with which it contends that plaintiff is truly a new owner of the property  in fact, a purchaser. ABC, as the original sole shareholder of the corporation at the time the title policy was purchased, cannot be said to be a new owner in that sense. Consequently, if ABC acquired the property through dissolution, there is no change of substance. The admission undermines the "operation of law" argument, the claim that only automatic transfers of title are covered. A transfer in dissolution to ABC is no different, in terms of voluntariness, than the transfer to the Development Company in dissolution.
Applicable rules of construction require Chelsea's policy to be interpreted to provide coverage if that interpretation is reasonable. The term "operation of law," as used in its definition of insured, read liberally, is not as limiting as defendant contends. Its exclusion of "purchasers," read strictly as required in the case of exclusions from coverage, Mt. Hope Inn v. Travelers Indem. Co., 157 N.J. Super. 431, 440 (Law Div. 1978), does not adversely affect a stockholder transferee in a corporate dissolution proceeding. Historic Smithville Development Co. is therefore an "insured" under Chelsea's policy. It is both a distributee and a corporate successor.

Substance Over Form
Defendant makes an alternative argument, based upon the ancient maxim that a court of chancery looks to substance rather than to form, explained as follows:
Equity always attempts to get at the substance of things, and to ascertain, uphold, and enforce rights and duties which spring from the "real" relations of parties. It will never suffer the mere appearance and external form to conceal the true purposes, objects, and consequences of a transaction. [2 Pomeroy's Equity Jurisprudence (5 ed. 1941), § 378 at 41]
*294 See, also, Brodzinsky v. Pulek, 75 N.J. Super. 40, 47 (App.Div. 1962); Kleinberg v. Schwartz, 87 N.J. Super. 216, 222 (App.Div. 1965), aff'd 46 N.J. 2 (1965). It claims that the Development Company is in truth a purchaser, a new owner of the property, and one never intended to be insured.
The argument is facially appealing. As a result of the purchase of the Inns' stock and the liquidation of that corporation, the partnership, an entirely new entity, acquired title to the real property. The transfer of the stock of Inns occurred on May 14, 1979. On that same date the plan of liquidation was adopted and title to the real property transferred. Thus, except for mechanics, there would be no difference, in terms of final result, between a purchase of the real estate by the Development Company and the purchase of the Inns' stock followed by its liquidation and the transfer of title.
Chelsea finds support for its argument in various decisions fixing the tax consequences which follow a purchase of corporate stock, the liquidation of the corporation and the transfer of assets to the shareholders. These cases hold that there is no difference, for tax purposes, between the acquisition of assets through liquidation and a direct purchase of the assets themselves. A typical case is Matter of Chrome Plate, Inc., 614 F.2d 990 (5 Cir.1980), cert. den. 449 U.S. 842, 101 S.Ct. 123, 66 L.Ed.2d 50 (1980), in which the court said:
Clearly, a purchase of stock and subsequent liquidation by the same corporation done wholly with the intent to acquire assets was no different than a direct purchase of assets. [at 999]
To the same effect: Commissioner v. Ashland Oil and Refining Co., 99 F.2d 588 (6 Cir.1938), cert. den. 306 U.S. 661, 59 S.Ct. 786, 83 L.Ed. 1057 (1939); Kanawha Gas and Utilities Co. v. Commissioner of Internal Revenue, 214 F.2d 685 (5 Cir.1954); New Jersey Transp. Dept. v. PSC Resources, 175 N.J. Super. 447, 456, n. 5 (Law Div. 1980).
These cases, however, construe the tax laws. Here, an insurance policy must be interpreted, and our rules require a liberal construction, favoring coverage. If Chelsea's policy may be so *295 read, there is coverage regardless of the substance of the transaction. There is no reason, as a matter of law, why a title policy may not cover the successor in title to a dissolved corporation. The policy may recognize form over substance, at the discretion of the insurer. Chelsea's policy has been here construed to cover plaintiff. No more is necessary. The question of substance over form has no relevance.
Putting this point aside, the substance of the present transaction, as defined by the title company, does not necessarily support the defense contentions. Chelsea admits that ABC would have retained coverage if it had dissolved the corporation and transferred the corporate property to itself, since that would not represent a change of substance. It also admits that if the Development Company had purchased the Inns stock from ABC and continued the existence of the corporation, the policy would remain in force. This simply recognizes the existence of the corporation as a legal entity distinct from its shareholders, Yacker v. Weiner, 109 N.J. Super. 351 (Ch.Div. 1970), aff'd 114 N.J. Super. 526 (App.Div. 1971), so that a change in stock ownership has no effect on the title of corporate assets. It is also a recognition of necessity. Were the rule otherwise and a public corporation were the insured, its stock could change hands on a daily basis; if continued ownership of the stock by the original shareholders were a condition of continued coverage, it would be impossible for such a corporation to maintain effective insurance. Nevertheless, on the issue of substance, when all of the stock of a corporation is sold to a new shareholder the control and real ownership of the corporate assets is changed entirely and the change is one of substance. Once coverage is recognized in this circumstance, it becomes increasingly difficult to argue that the transfer in dissolution by plaintiff to itself is any different than a like transfer by ABC, the original stockholder. If time is the distinguishing feature, the question as to how long the stock must be held by a new shareholder must be answered. Nothing in the policy supplies that answer. No valid distinction *296 is made or can be made between a shareholder who retains corporate stock for 50 years and one who retains stock for 50 minutes. Any suggestion that time makes a difference must be rejected. The only time frame to be considered is that which commences at the moment dissolution becomes effective and ends at the moment the transfer of title is complete. If the shareholders are the same during this time, the transferees are "corporate successors," as those words are used in the insurance policy. The only argument left is that the policy was intended to cover the original shareholders who acquired title in a dissolution proceeding and no other. If this were the rule, a public corporation, enjoying daily sales of its stocks, would lose the right to continue coverage after dissolution the moment the first sale occurred. This cannot have been the intention of the company when it adopted its definition of "insured."
Dissolutions are ordinary corporate transactions, occurring throughout the country on a daily basis. Tax and other concerns frequently attract plans of liquidation. One of the principal purposes of holding title in corporate form is to permit the easy transfer of real interests in corporate assets, through the transfer of stock. These considerations must have been known to Chelsea when it drafted and sold its policy. It also had to know that public corporations trade their stock constantly, so that any interpretation of the words "corporate successors" in a dissolution setting would be meaningless if it were limited to the original shareholders. The policy makes no distinction between public corporations and close corporations such as the Inns. These circumstances strongly indicate an intention on the part of Chelsea to cover successors in title through dissolution. They also define the reasonable expectations of policy holders. In terms of "substance," therefore, the real owners of the property were the new shareholders from the moment they acquired the stock. They were insured at that moment through the corporation. These shareholders were also the real owners after liquidation, *297 because they were one and the same.[2] There was no change of substance.
For these reasons I conclude that Chelsea must defend the suit of Hyland v. Burgess at its expense. Historic Smithville Development Co. is an "insured" under its policy. Plaintiff's order to show cause is allowed. Defendant's cross-motion for partial summary judgment is denied.
NOTES
[1] The Inns' plan of liquidation provides: "The Corporation shall distribute all of the assets of the Corporation, subject to all of the liabilities of the Corporation, to the shareholder, in complete redemption and cancellation of all of the outstanding stock of the Corporation. Assets of the Corporation shall be distributed in kind to the shareholder."
[2] The tax cases upon which Chelsea relies in part may in fact support this conclusion, since the courts in those cases said that the persons who purchased the stock of the corporation and then liquidated its assets, taking title in themselves, really purchased the assets when they purchased the stock, so that the basis of those assets when they were finally transferred in liquidation was the same as the purchase price of the stock. Thus, the change in substance occurred when the stock was purchased, not when the assets were transferred.