**LAWYERS TITLE INSURANCE CORP., Plaintiff,**

v.

**CAE–LINK CORPORATION, Defendant.**

Civ. A. No. MJG–92–3249.

United States District Court,
D. Maryland,
Northern Division.

Feb. 18, 1994.

Griffin Vann Canada, Jr., Rockville, MD, for plaintiff.

David H. Bamberger, Washington, DC, for defendant.

### MEMORANDUM OF DECISION

GARBIS, District Judge.

The Court has before it Counter–Plaintiff CAE–Link's Motion for Partial Summary Judgment and Lawyers Title Insurance Cor-

poration's Cross Motion for Summary Judgment. The Court has held a hearing on this matter and has had the benefit of the arguments of counsel and supplemental briefs.

### I. SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted only if the pleadings and supporting documents "show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In this case, neither party suggests the existence of a genuine issue of material fact. Hence, summary judgment is appropriate "to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)).

### II. FACTUAL BACKGROUND

This controversy involves land located in the Montgomery Industrial Park subdivision ("the Subdivision") in Montgomery County, Maryland. Through a "Declaration of Covenants and Restrictions" dated October 10, 1956, certain covenants, conditions, and restrictions were placed on the Subdivision. Among these were covenants prohibiting the dumping or storage of waste material and refuse (¶ 6); the discharge of untreated sewage or industrial waste (¶ 8(d)); and, the emission of objectionable odors outside the lot lines (¶ 8(f)).

On July 8, 1980, the Washington Suburban Sanitary Commission ("WSSC") acquired title to a parcel of land in the Subdivision, which is referred to herein as "Site II." At this time, the Singer Company [1] ("Singer") leased a separate parcel in the Subdivision ("the Property") from a third party and operated a facility on it.

Shortly after its July 1980 acquisition of Site II, WSSC erected and operated a sewage treatment facility on the parcel. In November of 1980, WSSC brought a declaratory

---

1. Operating through its Link Division.

judgment action in Montgomery County Circuit Court, styled *Washington Suburban Sanitary Comm'n v. Frankel,* Law No. 56245, which sought a declaration that WSSC would have no liability for constructing and operating its facility on Site II.

In March of 1981, Singer acquired ownership of the Property by deed from the lessor third party. On March 16, 1981, Lawyers Title Insurance Corp. ("LTIC") issued a policy of title insurance (the "Policy") in the amount of $10,300,000 for the Property, identifying Singer as the named insured and providing, *inter alia,* that "[t]his policy insures that the Restrictive Covenants are enforceable by the insured." (Policy Sched. B, ¶ 5, Compl. ex. 2.) Specifically, under the Policy, LTIC offered protection to Singer and

> those who succeed to the interest of [Singer] by operation of law as distinguished from purchase including, but not limited to, heirs, distributees, devisees, survivors, personal representatives, next of kin, or corporate or fiduciary successors.

(Policy ¶ 1(a), Compl. ex. 2.)

Another provision in the Policy further addressed the consequences of a change in the holder of title to the Property:

> The Coverage of this policy shall continue in force as of Date of Policy in favor of an insured so long as such insured retains an estate or interest in the land, or holds an indebtedness secured by a purchase money mortgage given by a purchaser from such insured, or so long as such insured shall have liability by reason of covenants of warranty made by such insured in any transfer or conveyance of such estate or interest; provided, however, this policy shall not continue in force in favor of any purchaser from such insured of either said estate or interest or the indebtedness se-

cured by a purchase money mortgage given to such insured.

(Policy ¶ 2, Compl. ex. 2.)

After Singer purchased the Property, it intervened in the *Washington Suburban Sanitary Comm'n v. Frankel* declaratory judgment action.

In 1984, the Court of Special Appeals of Maryland held in the declaratory judgment action that restrictive covenants are compensable property interests under the Takings Clause of the Fifth Amendment. *Washington Suburban Sanitary Comm'n v. Frankel,* 57 Md.App. 419, 470 A.2d 813 (1984), *vacated on other grounds,* 302 Md. 301, 487 A.2d 651 (1985). This ruling effectively denied WSSC's claim for declaratory relief. Singer and other property owners within the subdivision then pursued counterclaims under both an inverse condemnation theory and a nuisance theory. As noted below, the litigation continued through all times relevant to the instant case.[2]

In 1987, Singer was the subject of a corporate takeover and began a process of reorganization. The following is a summary of the events in the reorganization which are pertinent to the issues presented herein.

1. Singer, since 1981, was the owner of the Property.

2. On December 22, 1987, Link Tactical Military Simulation Corporation ("Link Corp.") was incorporated as a wholly-owned subsidiary of Singer.

3. Prior to April 25, 1988, Singer owned the Property and Link Corp. owned 589,933 shares of Singer stock.

4. On April 25, 1988, Link Corp. transferred the 589,933 shares of Singer stock to Singer and Singer transferred the Property[3] to Link Corp. by special warranty deed.

5. Sometime after April 25, 1988, Singer sold all of the stock in Link Corp. to CAE Industries Limited of Canada

---

2. In a letter dated December 3, 1987, counsel for Singer informed LTIC that WSSC had raised the issue of Singer's standing to sue because Singer had been a lessee, not an owner, at the time WSSC acquired Site II. LTIC agreed to pay the cost of litigating the standing issue. Until re- cently, LTIC has paid the attorneys' fees involved in the litigation of the standing issue.

3. The property was transferred together with certain other assets.

("CAE") and CAE merged Link Corp. with its newly incorporated wholly-owned subsidiary, CAE–Link Corporation ("CAE–Link").

6. Since then, the Property has been owned by CAE–Link.

In 1992, the Maryland Court of Special Appeals issued another decision in the WSSC litigation. That court held that CAE–Link lacked standing to sue WSSC on an inverse condemnation claim because Singer did not own the Property at the time WSSC acquired Site II. *CAE–Link Corp. v. Washington Suburban Sanitary Comm'n*, 90 Md. App. 604, 602 A.2d 239, 249 (1992). With respect to CAE–Link's nuisance claim against WSSC, the intermediate appellate court remanded the case for a new trial. *Id.* 602 A.2d at 246. The Maryland Court of Appeals, in a decision filed April 8, 1993, affirmed the Court of Special Appeals's remand of the nuisance claim. *Washington Suburban Sanitary Comm'n v. CAE–Link Corp.*, 330 Md. 115, 622 A.2d 745 (1993). The Court of Appeals, however, denied CAE–Link's petition for a writ of certiorari as to questions related to the inverse condemnation claim.

After the Court of Appeals denied certiorari as to the inverse condemnation claim, counsel for CAE–Link filed a demand on LTIC for: (i) the diminution in the value of the Property as a result of the condemnation by WSSC of the Restrictive Covenants; (ii) interest on that amount; and (iii) attorneys' fees incurred in *Washington Suburban Sanitary Comm'n v. Frankel* and related litigation. LTIC refused to indemnify CAE–Link for these losses.

## III. *DISCUSSION*

The question presented is whether or not the title insurance policy on the Property which Singer purchased on March 16, 1981, insures CAE–Link. Paragraph 1(a) of the Policy provides that "insureds" include only Singer and those who succeeded Singer's interest "by operation of law as distinguished from purchase." It is the position of LTIC that the policy lapsed on April 25, 1988, when ownership to the Property was transferred from Singer to Link Corp. in exchange for stock in Singer.[4] Of course, CAE–Link takes the opposite view.

While there is no precedent directly on point, two decisions cited by the parties provide some guidance to the meaning of the term "by operation of law" in the present context. Both involve title insurance contract provisions substantially identical to the one at issue here.

In *Pioneer Nat'l Title Ins. Co. v. Child, Inc.*, 401 A.2d 68, 71 (Del.1979),[5] the duPonts owned the subject property and wished to donate it to charity to obtain a tax deduction. On July 6, 1972, the duPonts transferred the property to the 1066 Foundation[6] ("1066") and title insurance was issued by Pioneer to 1066. Unfortunately, it proved impossible to qualify 1066 as a tax-exempt corporation. Therefore, on December 29, 1972, the Property was conveyed from 1066 back to the duPonts. Then, prior to the end of 1972, the duPonts transferred the property to Child, Inc.[7] In 1975, Child, Inc. contracted to sell the property and sustained a loss because of a title defect. Child, Inc. sought to recover this loss from Pioneer under the policy issued to 1066.

The Delaware court held that Child, Inc. was not an insured under the policy because it had not obtained title to the policy "by operation of law." The Supreme Court of Delaware stated that

"[o]peration of law" is a generic term or phrase commonly used to express the man-

---

4. There is no doubt that if Link Corp. were an insured then CAE–Link would also be an insured because title passed from Link Corp. to CAE–Link "by operation of law" as the result of the stock purchase and merger described above.

5. *See also Child, Inc. v. Rodgers*, 377 A.2d 374 (Del.Super.Ct.1977) (elaborating on the facts underlying the dispute).

6. This entity had originally been named The Child Foundation, a name also used for the second entity involved in the case. For simplicity it will be referred to here by its final name.

7. Child, Inc. began as Boys Home of Delaware, Inc., changed its name to The Child Foundation and then to Child, Inc. For simplicity it is here referred to by its final name.

ner in which rights (and/or liabilities) attach to a person by the "mere application to the particular transaction of the established rules of law, without the act or cooperation" of that person. *Black's Law Dictionary* (4 ed).

\*　\*　\*　\*　\*　\*

In "practical working and effect," the term indicates the manner in which a person acquires rights without any act of his own. *Merdzinski v. Modderman,* Mich.Sup.Ct., 263 Mich. 173, 248 N.W. 586 (1933). And the "operation" or impact of the law upon the particular transaction, without more, is to be contrasted with events caused by the voluntary action of the parties. In the latter case, the result is not caused by operation of law.

*Id.* at 70–71 (footnote omitted).

The Delaware Supreme Court concluded that all of the transactions which effected the transfer of title from 1066 to the duPonts and then to Childs, Inc. were voluntary and, thus, in the Court's view title did not pass by operation of law.

In *Historic Smithville Dev. Co. v. Chelsea Title & Guar. Co.,* 184 N.J.Super. 282, 445 A.2d 1174, 1178 (Ch.Div.1981), *aff'd in part and rev'd on other grounds,* 190 N.J.Super. 567, 464 A.2d 1177 (App.Div.1983), Historic Smithville Inns, Inc. ("Inns") was a wholly-owned subsidiary of ABC Leisure Attractions, Inc. ("Leisure") which in turn was a wholly-owned subsidiary of American Broadcasting Companies, Inc. ("ABC"). Inns owned the subject property and obtained title insurance on it from Chelsea in 1974. In 1978, the New Jersey Attorney General began litigation which placed in issue title to part of the subject property and Chelsea funded the Inn's defense of its title. In 1979, a series of transactions resulted in the ownership of the property being transferred to Historic Smithville Development Co., a partnership ("Development"). The following were the steps in the transaction:

1. Leisure sold the stock in Inns to Development.

2. Development liquidated Inns, effecting the transfer of all of Inns's assets to Development.

3. Title to the subject property was transferred to Development from Inns by deed incident to the liquidation.

Following these transactions, Development had title to the property and Chelsea took the position that Development had not acquired title to the property "by operation of law." Hence, Chelsea asserted, the title policy lapsed and it was no longer required to defend the pending lawsuit.

The Superior Court of New Jersey cited, but did not agree with, the Delaware Supreme Court's decision in *Pioneer.* The New Jersey Court did not believe that the term "by operation of law" should be limited to "strictly involuntary transfers." Rather, construing the policy liberally against the insurance company,[8] the *Historic Smithville* court held that the policy *"does not limit the terms 'insured' and 'operation of law' to strictly involuntary transferees."* *Id.* 445 A.2d at 1178 (emphasis added). Further, there can be, and was, a transfer by operation of law when anyone steps into the shoes of a corporation and thus becomes its successor in ownership. "Thus, if a corporation, in dissolution or otherwise, transfers all of its assets to some other entity or to an individual, the transferee is a 'successor' in every sense of the word." *Id.* at 1179.

This Court agrees with the results reached in *Pioneer* and *Historic Smithville* although it does not agree with the precise rationale of either decision.

Singer owned the subject property and title passed, through various steps, to CAE–Link for consideration. If this were done in a single step there is no doubt that title to

---

8. The New Jersey court's construction in favor of the insured was at least partly due to New Jersey's rule of construing insurance policies against the insurer. *See Historic Smithville Dev. Co. v. Chelsea Title & Guar. Co.,* 184 N.J.Super. 282, 445 A.2d 1174, 1177 (Ch.Div.1981), *aff'd in part and rev'd on other grounds,* 190 N.J.Super. 567, 464 A.2d 1177 (App.Div.1983). Maryland has no such presumption. *Collier v. MD–Individual Practice Ass'n,* 327 Md. 1, 607 A.2d 537, 539 (1992) ("We do not follow the rule, adopted in some states, that insurance policies are to be construed most strongly against the insurer.").

the Property would have passed by a purchase and not by operation of law. Hence, it would have been necessary for CAE–Link, the new owner, to pay a premium in order to have coverage from LTIC. It is, therefore, neither surprising nor inequitable that Singer was unable to structure this transaction by a series of steps so that at each step title passed by operation of law so that no additional unsecured premium would be required.

In any event, for whatever reasons it may have had,[9] Singer chose to obtain ownership of shares of its own stock from Link in exchange for the Property.[10] The subject transaction was a purchase. The transfer of title was not a secondary consequence of a transaction other than the exchange of the Property for consideration. This Court concludes that the Policy lapsed on April 25, 1988, when title to the Property was transferred to Link Corp. Link Corp. did not succeed to the interest of Singer by operation of law as distinguished from purchase. Because Link Corp. was not an insured, CAE–Link cannot be an insured under the Policy even though, in fact, title to the Property passed from Link–Corp. to CAE–Link by operation of law. Accordingly, summary judgment shall be granted to LTIC and it is unnecessary to resolve the additional defenses asserted by LTIC.[11]

## IV. CONCLUSION

For the foregoing reasons:

1. The Counter–Plaintiff CAE–Link's Motion for Partial Summary Judgment is **DENIED.**

2. The Lawyers Title Insurance Corporation's Cross Motion for Summary Judgment is **GRANTED.**

---

9. Perhaps the Singer transaction was structured as a matter of tax planning or to comply with pertinent regulations.

10. Note that Singer could have obtained the stock for Link, its subsidiary, by liquidating Link. However, this would leave ownership of the Property in Singer.

11. LTIC also claims that CAE–Link is seeking a double recovery because of the potential of duplicative damages on the pending nuisance claim, and that even if CAE–Link is an insured, there has been no actual loss until the Property is sold. In view of the decision that CAE–Link is not an insured, these issues are moot.