# IN THE SUPREME COURT, STATE OF WYOMING

## 2015 WY 150

### OCTOBER TERM, A.D. 2015

**November 24, 2015**

NORTH FORK LAND & CATTLE,
LLLP,

Appellant
(Plaintiff),

v.                                                            S-14-0314

FIRST AMERICAN TITLE
INSURANCE COMPANY,

Appellee
(Defendant).

---

*Appeal from the District Court of Fremont County*
The Honorable Norman E. Young, Judge

*Representing Appellant:*
　　M. Gregory Weisz of Pence and MacMillan LLC, Laramie, Wyoming.

*Representing Appellee:*
　　James R. Salisbury and Anthony M. Reyes of Riske, Salisbury & Reyes, P.C., Cheyenne, Wyoming. Argument by Mr. Salisbury.

*Before BURKE, C.J., and HILL, KITE\*, DAVIS, and FOX, JJ.*

*\*Justice Kite retired from judicial office effective August 3, 2015. Pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (LexisNexis 2015), she was reassigned to act on this matter on August 4, 2015.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KITE, Justice, Ret.**

[¶1]     North Fork Land & Cattle, LLLP (North Fork) appeals from the district court's order granting summary judgment in favor of First American Title Insurance Company (First American).  The district court ruled that North Fork was not an insured under title insurance policies issued by First American to North Fork's predecessors and, therefore, was not entitled to assert claims for damages resulting from an undisclosed encumbrance on the properties.

[¶2]     We conclude the district court did not apply the appropriate test to determine the meaning of the insurance contract, and, when the correct rules are applied, North Fork qualifies as an insured successor.  Consequently, we reverse and remand.

## ISSUES

[¶3]     North Fork presents the following issues for review:

> I.    Whether the district court improperly added language to a title insurance policy requiring that in order for a transfer of real property to qualify as a transfer by "operation of law" that the transfer must have been done only involuntarily, and therefore whether summary judgment was appropriate when the non-moving party provided uncontroverted evidence showing that it is entitled to coverage as a fiduciary/corporate successor to the named insured in the policy.
>
> II.   Whether the named insured party in a title insurance policy retained an estate and interest in the real property when the named insured was the co-organizer, general partner, limited partner, manager and beneficiary in a limited liability limited partnership that owns the real property and the named insured is entitled to a distribution in kind upon dissolution of the entity.
>
> III.  Whether the domestication and name change of a foreign limited liability limited partnership from Colorado to Wyoming and recording of a quitclaim deed done to memorialize the name change of record caused the loss of the warranty of title to the limited liability limited partnership from which it obtained title to the real property.

1

First American does not offer a separate statement of the issues on appeal.

**FACTS**

[¶4]    Between 1983 and 1999, Ronald and Carol Hansen purchased five separate properties and combined them to form a ranch in Fremont County, Wyoming. The Hansens held title to four of the properties as husband and wife. They obtained title insurance on the properties from First American and were named personally as insureds. Mr. Hansen held title to the other parcel as trustee of his revocable trust, and the First American title insurance policy listed him as an insured in that capacity.

[¶5]    In November 2000, Mr. Hansen conveyed the trust property to himself and his wife, and the Hansens then conveyed all of the properties by warranty deed to Hansens' North Fork Ranch, LLLP (HNF), a Colorado limited liability limited partnership. The limited liability limited partnership was created by the Hansens specifically for estate planning purposes, and Mr. Hansen passed away shortly after the conveyances. Wyoming later enacted legislation authorizing limited liability limited partnerships, and, in 2009, HNF converted to a Wyoming limited liability limited partnership and changed its name to North Fork Land & Cattle, LLLP. HNF quitclaimed the properties to North Fork to update the recorded legal title of the properties.

[¶6]    In 2008, the district court declared that Bunker Road, which crosses three of North Fork's properties, was established as a county road by Fremont County in 1913. *King v. Bd. of County Comm'rs of the County of Fremont,* 2010 WY 154, ¶ 9, 244 P.3d 473, 476 (Wyo. 2010). HNF intervened and contested the county road in the *King* action. This Court affirmed the county road designation in 2010. *Id.,* ¶ 1, 244 P.3d at 474.

[¶7]    First American failed to disclose that Bunker Road burdened the properties when the title insurance policies were issued to the Hansens. North Fork submitted notices of claims under the title insurance policies, asserting it was damaged by the Bunker Road encumbrance. First American did not respond to North Fork's claims, and North Fork filed suit against the insurer.

[¶8]    First American filed a motion for summary judgment on several bases. The district court granted summary judgment in favor of the insurer, concluding that North Fork did not meet the definition of "insured" under the title insurance policies and the Hansens could not be held liable under the warranty provisions of the policies because HNF transferred the properties to North Fork by quitclaim deeds. North Fork appealed.

2

**STANDARD OF REVIEW**

[¶9]   Our standard of review for a summary judgment order is *de novo. Fayard v. Design Comm. of the Homestead Subdivision,* 2010 WY 51, ¶ 9, 230 P.3d 299, 302 (Wyo. 2010); *Wyo. Med. Ctr. v. Wyo. Ins. Guarantee Ass'n,* 2010 WY 21, ¶ 11, 225 P.3d 1061, 1064 (Wyo. 2010).  Summary judgments are governed by W.R.C.P. 56(c):

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

Reviewing a summary judgment decision,

> we have exactly the same duty as the district judge; and, if there is a complete record before us, we have exactly the same material as did [the district judge].  We must follow the same standards.  The propriety of granting a motion for summary judgment depends upon the correctness of a court's dual findings that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law.  This court looks at the record from the viewpoint most favorable to the party opposing the motion, giving to him all favorable inferences to be drawn from the facts contained in affidavits, depositions and other proper material appearing in the record.

*McGarvey v. Key Pro. Mgmt. LLC*, 2009 WY 84, ¶ 10, 211 P.3d 503, 506 (Wyo. 2009), quoting *Nowotny v. L & B Contract Indus.,* 933 P.2d 452, 455 (Wyo. 1997).

[¶10]  Interpretation of the contractual language is a matter of law for the court, provided the language is clear and unambiguous.  *Cheek v. Jackson Wax Museum, Inc.,* 2009 WY 151, ¶ 12, 220 P.3d 1288, 1290 (Wyo. 2009); *Vargas Ltd. Partnership v. Four "H" Ranches Architectural Control Comm.*, 2009 WY 26, ¶ 11, 202 P.3d 1045, 1050 (Wyo. 2009).  If the language is not clear or there are other material issues of fact, summary judgment is not appropriate.  *Fayard,* ¶ 10, 230 P.3d at 302.

## DISCUSSION

[¶11]  The legislature addressed title insurance in the Wyoming Title Insurance Act, Wyo. Stat. Ann. §§ 26-23-301 through 336 (LexisNexis 2015).  Section 26-23-303(a)(xxi) defines a title insurance policy, in relevant part, as:

> (xxi) "Title insurance policy" or "policy" means a contract wherein, subject to the stated terms and conditions, a title insurer insures, guarantees or indemnifies owners of real or personal property or the holders of liens or encumbrances thereon or others interested therein against loss or damage suffered by reason of:
> (A) Defects in, adverse claims, liens or encumbrances in the title to the stated property;
> (B) Unmarketability of the title to the stated property;
> (C) Guaranteeing, warranting or otherwise insuring by a title insurance company the correctness of searches relating to the title to property;
> (D) Defects in the authorization, execution or delivery of an encumbrance upon such property[.]
> . . . .

[¶12]  Consistent with the statutory definition, this Court provided an overview of the purposes of title insurance in *Haines v. Old Republic Nat'l Title Ins. Co.*, 2008 WY 31, ¶ 10, 178 P.3d 1086, 1089  (Wyo. 2008) (internal citations omitted):

> A title insurance policy protects the insured against loss or damage as a result of defects in or the unmarketability of the insured's title to real property.  [T]he duty owed to an insured that arises through the issuance of a title insurance policy is contractual and subject to the policy's stated terms and conditions.

Title insurance policies provide indemnification to insureds damaged by title defects.

> The predominant view today is that title insurance—at least as to its first party aspect—is a contract of indemnity, and not a contract of guaranty or warranty. Consequently, a title insurer does not "guarantee" the status of the grantor's title.
>
> As an *indemnity* agreement, the insurer agrees to reimburse the insured for loss or damage sustained as a result of title

4

problems, as long as coverage for the damages incurred is not excluded from the policy . . . .

*Id.* at 1090, quoting *Stewart Title Guaranty Co. v. West,* 676 A.2d 953, 960-62 (Md. Ct. App. 1996) (emphasis in original).

[¶13] Resolution of the case at bar requires interpretation of the title insurance policies. The policies are standard American Land Title Association (ALTA) forms from 1970 through 1992, and they all contain the same relevant language. Two provisions of the title insurance policies are particularly important to this case. Paragraph 1(a) defines an "insured" as:

> The insured named in Schedule A, and, subject to any rights or defenses the Company may have had against the named insured, those who succeed to the interest of such insured by operation of law as distinguished from purchase including, but not limited to, heirs, distributees, devisees, survivors, personal representatives, next of kin, or corporate or fiduciary successors.

Paragraph 2 addresses the continuation of insurance after conveyance of title:

> The coverage of this policy shall continue in force as of Date of Policy in favor of an insured so long as such insured retains an estate or interest in the land, or holds an indebtedness secured by a purchase money mortgage given by a purchaser from such insured, or so long as such insured shall have liability by reason of covenants of warranty made by such insured in any transfer or conveyance of such estate or interest; provided, however, this policy shall not continue in force in favor of any purchaser from such insured of either said estate or interest or the indebtedness secured by a purchase money mortgage given to such insured.

[¶14] This Court has historically applied certain parameters to interpret insurance policies. In *Doctors' Co. v. Ins. Corp. of America,* 864 P.2d 1018, 1023-24 (Wyo. 1993), we explained that courts interpret insurance policies like other contracts but give the language the plain meaning a reasonable insured would understand it to mean.

> Our established rules of contract interpretation apply to insurance policies. *Albany County School Dist. No. 1,* 763 P.2d at 1258; *Hursh Agency, Inc. v. Wigwam Homes, Inc.,* 664 P.2d 27, 31 (Wyo.1983). Interpretation is the process of

5

ascertaining the meaning of the words used to express the intent of the parties. *Commercial Union Ins. Co. v. Stamper,* 732 P.2d 534, 539 (Wyo.1987); 4 Walter H.E. Jaeger, *Williston on Contracts* § 600A at 286 (3d. ed. 1961). The intent of the parties is determined by considering the instrument which memorializes the agreement of the parties as a whole. *Klutznick v. Thulin,* 814 P.2d 1267, 1270 (Wyo.1991). **This court utilizes a standard of interpretation for insurance policies which declares that the words used are given the plain meaning that a reasonable person, in the position of the insured, understands them to mean.** *Worthington v. State,* 598 P.2d 796, 806 (Wyo.1979); *Wilson v. Hawkeye Casualty Co.,* 67 Wyo. 141, 215 P.2d 867, 873–74 (1950). *See also Abifadel v. Cigna Ins. Co,* 8 Cal.App.4th 145, 9 Cal.Rptr.2d 910, 919 (1992).

If the language is unambiguous, our examination is confined to the "four corners" of an integrated contract and [parol] evidence is not admitted to contradict the plain meaning. *Prudential Preferred Properties v. J and J Ventures, Inc.,* 859 P.2d 1267, 1271 (Wyo.1993). The language of an insurance policy is ambiguous if it is capable of more than one reasonable interpretation. *Helfand v. National Union Fire Ins. Co. of Pittsburgh, Pa.,* 10 Cal.App.4th 869, 13 Cal.Rptr.2d 295, 299 (1992). Because insurance policies represent contracts of adhesion where the insured has little or no bargaining power to vary the terms, if the language is ambiguous, the policy is strictly construed against the insurer. *Albany County School Dist. No. 1,* 763 P.2d at 1258; 7 Walter H.E. Jaeger, *Williston on Contracts* § 900 at 19, 29 (3d ed. 1963). However, the language will not be " 'tortured' " to create an ambiguity. *Stamper,* 732 P.2d at 539 (*quoting McKay v. Equitable Life Assur. Soc. of United States,* 421 P.2d 166, 168 (Wyo.1966)).

*Id.* (emphasis added). *See also Kirkwood v. CUNA Mut. Ins. Soc'y,* 937 P.2d 206, 208 (Wyo. 1997) (interpreting an unambiguous insurance policy in the context of a summary judgment by giving the words used the plain meaning that a reasonable person, in the position of the insured, would understand them to mean); *Gainsco Ins. Co. v. Amoco Prod. Co.,* 2002 WY 122, ¶ 47, 53 P.3d 1051, 1066 (Wyo. 2002) (stating "[w]e interpret insurance policies just as we interpret other contracts, except that words used in an insurance policy are given the plain

6

meaning that a person in the position of the insured would understand them to mean").

### Paragraph 1(a) of Policy

[¶15]  As we stated above, Paragraph 1(a) of all the policies at issue in the present case defined an "insured" as:

> the insured named in Schedule A, and, subject to any rights or defenses the Company may have had against the named insured, those who succeed to the interest of such insured by operation of law as distinguished from purchase including, but not limited to, heirs, distributees, devisees, survivors, personal representatives, next of kin, or corporate or fiduciary successors.

[¶16]  Granting summary judgment in favor of First American, the district court ruled the Hansens' transfer of the properties to HNF did not occur by "operation of law;" consequently, neither limited liability limited partnership qualified as an insured under Paragraph 1(a) of the policy.  The phrase "operation of law" is not defined in the policy, and the district court relied upon *Shotmeyer v. New Jersey Realty Title Ins. Co.,* 948 A.2d 600 (N.J. 2008), in determining the meaning of this policy language.  The New Jersey court focused on the technical meaning of the term "operation of law," in concluding the successor to the named insured did not fall within the title policy's definition of "insured."  The court stated that a transfer occurs by "operation of law" only when it is automatic or involuntary under the law.  *Id.* at 608.  *See also Pioneer Nat'l Title Ins. Co. v. Child, Inc.,* 401 A.2d 68, 71 (Del.1979) ("operation of law" means "the manner in which a person acquires rights without any act of his own"); *Black's Law Dictionary* 1265 (10th ed. 2014) (operation of law means a legal outcome that automatically occurs whether or not the affected party intends it to).  Although it emphasized the involuntary nature of a transfer by operation of law, the *Shotmeyer* court also recognized that another New Jersey case had concluded a **voluntary** transfer of assets from a dissolved corporation, pursuant to a plan of liquidation, occurred by operation of law under the title insurance language.  *Id.* at 608, citing *Historic Smithville Dev. Co. v. Chelsea Title & Guar. Co.,* 184 N.J. Super. 282, 291–93, 445 A.2d 1174 (Ch. Div. 1981), *aff'd,* 190 N.J. Super. 567, 464 A.2d 1177 (App. Div. 1983).

[¶17]  As demonstrated by this apparent inconsistency in New Jersey jurisprudence, the legalistic definition of the phrase "operation of law" is not easy to apply.  The technical distinction between voluntary actions and those that are involuntary and therefore occur "by operation of law" has been fodder for numerous court opinions in various circumstances.  *See* B. Burke, *Law of Title Ins.,* § 5.01[A], 5-8 through 5-10 (3rd ed. 2014) and cases collected therein.  The United States Supreme Court long ago remarked

7

on the inherent difficulty of determining whether a consolidation of a national and state bank occurred by operation of law:

> If the words 'wholly by operation of law,' as used in the administrative regulations, refer here to the entire process of consolidation, of which the transfer of securities is an essential part, the exemption cannot be applied. But in a broad sense, few if any transfers ever take place 'wholly by operation of law' for every transfer must necessarily be a part of a chain of human events, rarely if ever other than voluntary in character. Thus to give any real substance to the exemption, we must take a more narrow view and examine the transfer apart from its general background. We must look only to the immediate mechanism by which the transfer is made effective. If that mechanism is entirely statutory, effecting an automatic transfer without any voluntary action by the parties, then the transfer may truly be said to be 'wholly by operation of law.'

*United States v. Seattle-First Nat'l Bank,* 321 U.S. 583, 587-88, 64 S. Ct. 713, 88 L. Ed. 944 (1944).

[¶18] It appears the majority of courts that have considered the meaning of the "operation of law" language in standard ALTA policies have applied a narrow interpretation and concluded it included only involuntary transfers. *See, e.g., Shotmeyer, supra; Pioneer, supra; Kwok v. Transnation Title Ins. Co.,* 89 Cal. Rptr. 3d 141 (Cal. Ct. App. 2009). These cases focus on the technical definition of "operation of law" with little or no inquiry into the intent of the parties or how a reasonable insured would understand the policy language. Likewise, the district court in this case did not consider the plain meaning of the language but simply relied on *Shotmeyer* in ruling North Fork was not an insured because the transfer of the properties to HNF did not occur involuntarily or automatically under the law.

[¶19] We are unable to square the district court's and the other courts' decisions with our rules of insurance contract interpretation, which require that we look to the plain meaning of the language as a reasonable insured would. *See generally, Ecosystem Res., L.C. v. Broadbent Land & Res., L.L.C.,* 2007 WY 87, ¶ 34, 158 P.3d 685, 693-94 (Wyo. 2007) (stating that it is improper to apply a rule obtained from cases outside Wyoming "without considering whether the 'rule' was consistent with the general intent of the parties to the . . . deeds"). When our rules of insurance contract interpretation are applied to the title insurance policy at issue here, the language is clear and unambiguous. Although "operation of law" is not a term that is part of the common vernacular, its meaning becomes clear when we consider it within the context of the whole provision.

8

*See, e.g., State ex rel. Arnold v. Ommen,* 2009 WY 24, ¶ 40, 201 P.3d 1127, 1138 (Wyo. 2009) ("[w]e interpret contracts as a whole, reading each provision in light of all the others to find the plain and ordinary meaning of the words").

[¶20] The policy refines the definition of "operation of law" by distinguishing it from transfers by "purchase." The technical meaning of purchase is to acquire property through voluntary transaction, rather than by descent or inheritance. *Black's Law Dictionary* 1429 (10ᵗʰ ed. 2014). However, in common parlance, "purchase" means "to acquire by the payment of money or its equivalent; buy." *Random House Dictionary* (2015). *See also, Albrecht v. Zwaanshoek Holding EN Financiering, B.V.,* 816 P.2d 808, 814 (Wyo. 1991) (holding that the plain meaning of the phrase "to redeem the real estate by paying to the purchaser * * * the amount of the purchase price" in a statute was that the "redeemer must pay in money or its equivalent"). Thus, the ordinary meaning of a transfer by operation of law would be one that did not involve an exchange of money or other equivalent consideration.

[¶21] The plain and ordinary meaning of "those who succeed to the interest of such insured by operation of law" must also be determined in light of the examples of covered successors provided in the policies, including but not "limited to heirs, distributees, devisees, survivors, personal representatives, next of kin, or corporate or fiduciary successors." Mr. Burke in *Law of Title Insurance* at 5-9 observes that not all of the transferees listed in the title insurance policy as taking "by operation of law" take by involuntary transfer. He gives "devisee" as an example. Various voluntary actions must take place for a devisee to receive title to a property, including the voluntary act of a testator incorporating the devise of the property in his will and the consent of the devisee to take under the will. *Id.* Additionally, before a devisee takes from a will, the personal representative must submit the will to probate, the probate court must order the distribution after ensuring that all creditors have been paid, and the property must pass out of the estate in the form of a personal representative's or executor's deed. *See* Wyo. Stat. Ann. §§ 2-7-201 through 206, 602 through 627, 701 through 729, 813 (LexisNexis 2015). These actions are not necessarily automatic or involuntary. As recognized by the New Jersey Superior Court in *Historic Smithville*, 445 A.2d at 1179, "[t]ruly automatic transfers of title to real property occur only by survivorship in a joint tenancy and through intestate succession." Thus, the list of examples of transfers by operation of law in Paragraph 1(a) extend the meaning of that phrase beyond its technical definition of only involuntary or automatic transfers.

[¶22] Transfers to fiduciary or corporate successors are included within the list of transfers by operation of law which qualify for continued coverage of the title insurance policies. The order of the words in the phrase is important. The terms fiduciary and corporate modify successor, much like the term football modifies game in the phrase "football game." That term tells the reader that it is "game" that described by the preceding noun as involving a "football." If we reverse those words they mean

9

something else entirely, a "game football." That would be a football which is further defined as the one used in the game. Therefore, under the title policies, the terms corporate and fiduciary modify successor.

[¶23] Some authorities would extend coverage only when a fiduciary or corporation is a named insured and is succeeded by another fiduciary or corporation. For example, in *Carney-Dunphy v. Title Co. of Jersey,* 2009 WL 1874060, *7 (D.N.J. 2009), the United States District court for the District of New Jersey reasoned that a "'fiduciary successor,' more frequently called a 'successor fiduciary,' is a 'fiduciary who is appointed *to succeed or replace a prior one.' Black's Law Dictionary* 640 (7th ed.1999) (emphasis added)." In order to reach this result, the court reversed the words in the policy. As explained above, the reversal of the words is not appropriate and changes the meaning of the terms. Applying the language actually used in the policy, "corporate or fiduciary successor," the policy covers a named insured's successor that is a fiduciary or corporate entity.[1]

[¶24] With these principles in mind, we turn to the circumstances of this case. The Hansens transferred their individual interests in the properties to the HNF limited liability limited partnership. No money or other valuable consideration changed hands when the properties were transferred into HNF, so a reasonable insured would not have believed the transfers were "purchases" under with the plain meaning of that term. The Hansens' transfers were made in accordance with partnership law and under the terms of a partnership agreement which restricted transfers of partnership interests outside of the family. The Hansens' undisputed intent was to provide a means of passing their property to their heirs. This is exactly the same intent as other transfers that are expressly included within the policy definition of transfers occurring by "operation of law," i.e., transfers to "heirs, distributees, devisees, survivors, personal representatives [and] next of kin."

[¶25] In addition, HNF qualifies as the Hansens' corporate successor. The Hansens transferred the property to HNF, which is a limited liability limited partnership. Limited liability limited partnerships are recognized business entities in Colorado and Wyoming. *See* Wyo. Stat. Ann. §§ 17-14-202(a)(xv), 17-14-301, 17-14-503 (LexisNexis 2015); C.R.S.A. § 7-64-1002. In transferring their interests to the partnership, the Hansens retained ownership of the entity, as both general and limited partners. The partnership was, therefore, their successor which was corporate in nature.

[¶26] HNF was also the Hansens' fiduciary successor. "[A] general partner of a limited partnership has a fiduciary duty of loyalty to the limited partnership, as well as a duty of good faith and fair dealing." *Wallop Canyon Ranch, LLC v. Goodwyn,* 2015 WY 81, ¶ 49, 351 P.3d 943, 957 (Wyo. 2015). HNF and the partners, therefore, had fiduciary

---

[1] Our interpretation of the terms would also include corporate entities or fiduciaries whose predecessors held title to the property in the same capacity, i.e. a predecessor corporation or fiduciary that was a named insured.

relationships and responsibilities.

[¶27] Clearly, the Hansens' successor, HNF, fell within the title policies' definition of "insured" in several ways. North Fork is also an insured because it automatically took ownership of the property when it converted to a Wyoming limited liability partnership in accordance with Wyo. Stat. Ann. § 17-26-101; amended its certificate of limited partnership to change its name to North Fork under Wyo. Stat. Ann. § 17-14-302; and withdrew its registration as a Colorado limited liability limited partnership. Under § 17-26-101(g), HNF's property became North Fork's property:

> (g) Upon conversion, all property owned by the converting entity remains in the newly converted entity. All obligations of the converting entity continue as obligations of the newly converted entity. Any action or proceeding pending against the converting entity may be continued as if the conversion had not occurred.

Although HNF quitclaimed the properties to North Fork, North Fork already owned the property under the Wyoming law cited above. The only purpose of the quitclaim deeds was to give record notice of the conversion to a Wyoming limited liability limited partnership and the name change. The district court erred as a matter of law when it concluded North Fork was not a covered insured under the terms of the policies.

[¶28] Our decision is consistent with the changes made to the ALTA policy in 2006. Under the newer version of the policy, "insured" means the party named as the insured in Schedule A of the policy and also includes:

> (A)    successors to the Title of the Insured by operation of law as distinguished from purchase, including heirs, devisees, survivors, personal representatives, or next of kin;
> (B)    successors to an Insured by dissolution, merger, consolidation, distribution, or reorganization;
> (C)    successors to an Insured by its conversion to another kind of Entity;
> (D)    a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title[:]
>       (1)    if the stock shares, memberships or other equity interests to the grantee are wholly-owned by the named Insured,
>       (2)    if the grantee wholly owns the named Insured,
>       (3)    if the grantee is wholly-owned by an affiliated Entity of the named Insured, provided the affiliated Entity and

11

the named Insured are both wholly-owned by the same person or Entity, or

(4)   if the grantee is a trustee or beneficiary of a trust created by a written instrument established by the Insured named in Schedule A for estate planning purposes."

ALTA Owner's Policy, Conditions 1(d) (2006), retrieved from www.alta.org/forms.

[¶29]  Commentators have been critical of title insurers who denied coverage under the earlier versions of the ALTA policy when individual named insureds transferred their property to entities for estate planning purposes.  Similarly, they have criticized courts that elevate form over substance to deny continued title insurance coverage to an insured's successors in certain lifetime transfers.  Joyce Palomar addressed this issue in 1 *Title Insurance Law* § 4.23 (2008).  She stated that cases narrowly defining the policy language to exclude transfers from an individual insured to his revocable living trust fail to "recognize the substantive reality that continuing a title policy's coverage in favor of an insured's trustee or beneficiaries presents no different or greater risk to the insurer than does the policy's express continuing coverage in favor of the insured's heirs, devisees and personal representatives."[2]  *Id.* at 4-54 through 4-55.  *See also*, J. Riven & T. Stikker, *Title Insurance of Estate Planning Transfers,* 12 Prob. & Prop. 15 (1998) (referring to a title insurer's denial of coverage after a named insured transfers his property into a revocable trust in which he is the trustee as "extreme").

[¶30] Ms. Palomar continued this line of reasoning in an article discussing the 2006 changes to the standard ATLA policy:

> The definition of the *insured* in both the 2006 ALTA Owner's and Loan Policies includes all parties covered by the 1992 policies. The 2006 definition also adds some important clarifications regarding who will be covered as a *successor* to the named insured. First, the definition expressly includes "successors to an Insured by its conversion to another kind of Entity." . . .

---

[2] Ms. Palomar's comments addressed a case from the United States District Court for the District of Wyoming, which was affirmed in an unpublished Tenth Circuit opinion.  *Covalt v. First Am. Title Ins. Co.,* 105 F.3d 669 (10th Cir. 1997).  *Covalt* considered title policy language that was narrower than the language at issue in this case.  The policy language extended continuing coverage only to "the heirs, devisees, [and] personal representatives of such [i]nsured," and the court ruled the language did not cover a transfer into a trust.  Commenting on the *Covalt* case in the *Law of Title Insurance,* Mr. Burke stated the result might have been different if the policy defined insured as in this case.  He suggested that the court might have been able to "bring the trust under the rubric of a 'fiduciary successor.'"  *Id.* at § 5.01[A], 5-7.

12

[T]he new policy definition will prevent litigation over whether a title insurance policy continues to cover when the insured transfers real property to the trustee of a trust that the insured has established for estate-planning purposes. This author remembers an American Bar Association's Real Property, Probate and Trust Section Title Insurance Committee meeting in the early 1990s at which a member asked this exact question. The prior ALTA policy versions named heirs, devisees, survivors, personal representatives, and next of kin as successor insureds, but were not up-to-date with the newer practice of passing property at one's death by creating a revocable inter vivos trust. A vice-president of a major title insurance underwriter in attendance at the meeting replied that he could not imagine a title insurer declining a claim on grounds that an insured owner had transferred title to herself as trustee of her own revocable trust and at her death to beneficiaries of her trust, instead of to devisees via her will or heirs via laws of intestacy. He explained that he could see no increased risk for the title insurer when an insured transfers title into a trust for purposes of distribution to beneficiaries after the insured's death, compared to when the insured's property passes to a devisee via a will or an heir via intestacy. Soon thereafter, however, title insurers argued the opposite. A few courts applied form over substance to find that earlier title insurance policy versions that expressly covered heirs, devisees, survivors, personal representatives, and next of kin, did not cover a trustee or the beneficiaries of the insured's trust.

The 2006 definition of the insured additionally includes a grantee of an insured under a deed delivered without payment of actual valuable consideration. This clause also will be important in preventing the substantial amount of litigation that has occurred when parties conveyed title by deed without consideration to a solely-owned LLC or corporation for estate-planning or liability-protection purposes.

J. Palomar, *The 2006 ALTA Title Ins. Policies: What New Protection Do They Give?* 42 Real Prop. Prob. & Tr. J. 1, 24-26 (2007). *See also* M. Bidar, *Problem Solved? Title Insurance Coverage for Real Property Transfers,* 17 Ohio Prob. L.J. 118 (2007) (noting the 2006 changes to the ALTA policy providing for coverage when property is transferred into a trust "is a long overdue clarification").

[¶31] *Historic Smithville, supra,* followed a similar rationale. Historic Smithville Inns, Inc. held title to real property and obtained title insurance from Chelsea Title. The policy included the same definition of "insured" as in this case. The New Jersey Attorney General brought an action against the Inns challenging its title to a portion of the property. Chelsea defended the suit until a development company, which was organized as a partnership, purchased the corporation's stock and then proceeded to dissolve the Inns and transfer the assets to the partnership. Chelsea maintained that the purchasing partnership did not fall within the definition of "insured" in the title policy and refused to continue to defend the title. *Historic Smithville,* 445 A.2d at 1175-76.

[¶32] The New Jersey court rejected the title insurer's narrow definition of "operation of law," as including only transfers that occurred by involuntary action. It explained:

> Chelsea's policy covers not only the named insured but also "those who succeed to the interest of such insured by operation of law as distinguished from purchase...." A strict interpretation of the words "by operation of law," favored by Chelsea, would limit coverage to those who acquire title on an entirely involuntary basis, *e.g.*, a surviving tenant in a joint tenancy of real property. Also clearly included as involuntary transferees would be heirs and next of kin who acquire title as the result of death and not as the result of an agreement or a will. They are specifically mentioned in the policy. Does one who succeeds to the named insured's title by virtue of a corporate dissolution acquire title "by operation of law"? Chelsea argues that the transfer is voluntary and therefore does not meet the proper definition of that language. That language, however, must be read much more broadly than Chelsea suggests; it must be construed liberally, not strictly. It does not limit the terms "insured" and "operation of law" to strictly involuntary transferees. In several instances it includes in its definition of "insured" those who acquire title through some voluntary action. For example, "devisees" are covered. A "devisee" is one who acquires title to real property by will, *Kayhart v. Whitehead*, 77 *N.J.Eq.* 12, 76 *A.* 241 (Ch. 1910), and therefore by the voluntary act of the testator. The devise is not effective until the will is probated, a voluntary action very similar to the delivery and recording of a deed in the execution of a liquidation plan by the directors of a dissolved corporation. A devise may be subject to a power of sale. When the power is released by a deed from the executor it does not make the grantee any less a devisee, although it relinquishes control in the same way as a deed in dissolution.

14

In 13 *N.J. Practice (Lieberman, Abstracts and Titles)*, § 123, a devise is described as a "purchase." The policy here expressly excludes "purchasers" from coverage, while expressly including devisees. Under usual rules of construction the specific term "devisees" would prevail over the general term "purchaser." *Ohio Cas. Ins. Co. v. Flanagin*, 44 *N.J.* 504, 210 *A.*2d 221 (1965). Further, application of the rule of liberal construction to this contradictory language produces the obvious conclusion that devisees are covered. Thus, Chelsea does not exclude all "purchasers" from its definition of "insured." The policy also extends coverage to "distributees." The word is very broad. It may include persons to whom real property is distributed by an executor, a possible discretionary act, and those to whom a corporation in the process of dissolution distributes its real estate. The policy does not limit the term. A "fiduciary successor" is described as an "insured." There are many fiduciary relationships. Partners stand in a fiduciary relationship to each other. A new partner who is substituted for another may be a "fiduciary successor." If so, the substitution, though not in any sense "by operation of law," would not disturb coverage even though a 99% interest in the partnership assets changed hands. "Corporate successors" are covered. This is loose language. It would seem to encompass all who step into the shoes of the corporation, who become its "successors." Thus, if a corporation, in dissolution or otherwise, transfers all of its assets to some other entity or to an individual, the transferee is a "successor" in every sense of the word.

*Id.* at 1178-79. Applying a more pragmatic definition of "operation of law," the New Jersey court concluded that the partnership successor to the dissolved corporation was a covered "insured." *Id.* at 1182. *See also*, *Ticor Title Ins. Co. v. Am. Resources, Ltd.,* 859 F.2d 772 (9th Cir. 1988) (holding an individual member who had contributed property to a joint venture was entitled to coverage under a title insurance policy issued to the joint venture for contributed property).

[¶33] By ruling North Fork is a covered insured in this case, we are taking a minority position. However, in order to follow the majority, we would have to disregard Wyoming law that requires we consider the intent of the parties and interpret the language using the plain meaning a reasonable insured would understand it to mean. Moreover, we agree with the authorities who are critical of an overly formalistic approach to this issue. We do caution, however, that we are addressing the specific facts of this case where the insured parties transferred the property to a limited partnership

15

made up only of the insured parties and their legal heirs for the express purpose of estate planning.

[¶34] Our determination that North Fork is a covered insured under the terms of the title insurance policy is dispositive. We do not, therefore, need to address whether the Hansens retained an estate or interest in the properties or whether warranty coverage existed under Paragraph 2 of the policy.

[¶35] Reversed and remanded for proceedings consistent with this opinion.