2017 WY 104

Sara E. HURST, Individually, and Sara E. Hurst, as the Duly Appointed Wrongful Death Representative of the Estate of Larry G. Hurst, Appellants, (Defendants/Counterclaim Plaintiffs),

v.

METROPOLITAN PROPERTY AND CA-SUALTY INSURANCE COMPANY, Appellee, (Plaintiff/Counterclaim Defendant).

S-17-0082

Supreme Court of Wyoming.

September 12, 2017

Representing Appellants: Autumn Aspen, John Coppede, Quinton Parham, and Richard D. Bush of Hickey & Evans, LLP, Cheyenne, Wyoming. Argument by Mr. Bush.

Representing Appellee: Megan Overmann Goetz of Pence and MacMillan, LLC, Laramie, Wyoming.

Before BURKE, C.J., and HILL, DAVIS, KAUTZ, JJ., and KRICKEN, D.J.

KRICKEN, District Judge.

[¶1] On May 31, 2014, Larry Hurst was killed and Sara Hurst, seriously injured, while riding their bicycles after a vehicle, driven by Hannah Terry (Terry), negligently and consecutively struck each of their bicycles. Terry was not insured at the time. Thereafter, the Hursts filed a claim with their uninsured motorist insurance carrier, Metropolitan Property and Casualty Insurance Company (MetLife), who, in turn, filed a Complaint for Interpleader against Sara Hurst; the Estate of Larry Hurst (collectively, the Hursts); and Blue Cross Blue Shield of Wyoming,[1] seeking an order that the de-

---

1. Blue Cross Blue Shield of Wyoming (BCBS) asserted a claim against the $300,000 deposited by MetLife in the interpleader action for reimbursement of the medical bills paid to treat the injuries Sara Hurst sustained as a result of being stricken by Terry's minivan on May 31, 2014.

fendants interplead and settle their rights to the uninsured motorist (UIM) coverage provided for in the Hursts' MetLife policy (the Policy). The Policy provided UIM coverage/benefits in the amount of "$300,000 each person/$300,000 each accident." MetLife contended that the injuries to the Hursts and caused by Terry were the result of one (1) accident, resulting in a maximum of $300,000 in coverage. The Hursts argued that their injuries were the result of two (2) accidents, warranting $600,000 in coverage. The Hursts and MetLife filed cross-motions for summary judgment, along with a stipulation of the underlying facts. The district court granted summary judgment in favor of MetLife, finding there was only one (1) accident for purposes of determining the amount of UIM coverage. The Hursts appealed. We reverse and remand, concluding that, although the district court adopted the correct legal theory upon which to determine the number of accidents for application of UIM coverage and policy limits, the factual record is insufficient for a legal conclusion as to whether Terry maintained or regained control of her vehicle during her collisions with the Hursts. As a result, summary judgment was improperly granted.

## ISSUE(S)

[¶2] In their appeal, the Hursts present the following issue(s):

1. Did the district court err in its ruling on cross-motions for summary judgment that there was one (1) rather than two (2) accidents for purposes of determining the amount of uninsured motorist coverage for Joint-Appellants Larry and Sara Hurst who were separately struck by an uninsured motorist while on bicycles?

Stated more specifically:

(a) Did the district court adopt the correct theory, i.e. causation, to determine there was one (1) accident in a case involving uninsured motorist coverage?

(b) Did the district court correctly apply the causation theory to determine there was one (1) accident in light of the stipulated facts?

(c) Did the district court correctly apply the *Matty* decision, which it relied on, to determine there was only one (1) accident?

(d) Did the district court properly construe/interpret the uninsured motorist coverage to determine that one (1) accident, a term that is undefined in the applicable policy, occurred on May 31, 2014?

MetLife generally agrees, phrasing the issue as:

Whether the district court correctly determined there was "one accident" at issue in this matter.

## FACTS

[¶3] The parties stipulated to the following facts before the district court, as follows:

On May 31, 2014, at approximately 12:10 p.m., Larry and Sara were riding separate bicycles and headed south in the 4000 block of Coffeen Avenue/US Highway 87 near the city of Sheridan, state of Wyoming. Sara was riding her bicycle approximately thirty (30) feet in front of Larry. Both bicycles were being ridden on the shoulder of the road, within the emergency lane, and out of the lane of traffic.

At approximately 12:10 p.m. on May 31, 2014, Hannah Terry, driving a 2012 Dodge Caravan (minivan), was also traveling south on Coffeen Avenue at a speed of approximately fifty (50) MPH when her minivan entered the emergency lane (shoulder of the road).

. . .

After entering the emergency lane, the left front of her minivan struck Larry's bicycle from behind, throwing Larry from his bicycle and over the roof of the minivan. Larry was thrown approximately 166 feet following impact with the minivan. . . .

After striking Larry, the minivan continued to travel in the emergency lane for approximately thirty (30) more feet before it struck Sara's bicycle from behind. After

---

BCBS settled its claim against Sara in the underlying interpleader action.

being struck by the left front of the minivan, Sara's bicycle was pushed by the minivan until it came to a stop. Sara remained on the hood of the minivan after it struck her. At some point following the impact, Sara also struck the windshield of the minivan. . . .

There was approximately one-half (1/2) to one (1) second between Hannah Terry first striking Larry Hurst and subsequently striking Sara Hurst with the minivan.

. . .

Larry succumbed to his injuries shortly after being struck by the minivan, which was a direct result of the negligent driving of Hannah Terry. . . .

Sara sustained multiple serious physical injuries and trauma as a result of the negligent driving of Hannah Terry, including a concussion, collapsed lung(s), pulmonary contusion, internal bleeding, a thoracic fracture, as well as fractures to her leg and ribs. . . . .

The minivan showed no mechanical failure and appeared to be in good condition.

The roadway was in good condition and was not a factor.

The weather was good and was not a factor.

Both bicycles ridden by the Hursts were in good condition and were not factors.

Both bicycles ridden by the Hursts were about 2.5 to 3 feet inside the shoulder of the road and were not an obstacle to traffic.

Hannah Terry had sufficient sight distance before striking the bicycles ridden by the Hursts.

Hannah Terry had driven her vehicle onto the shoulder of the road when she struck the bicycles ridden by the Hursts, even though there were no obstacles in the road.

(Internal paragraph numbers omitted.)

[¶4] On the date of these events, Terry was an uninsured driver. The Hursts were named insureds on an automobile liability insurance policy they purchased from MetLife (the Policy). The Policy provided uninsured motorist (UIM) coverage in the amount of "$300,000 each person/$300,000 each accident."

[¶5] The Policy endorsement for UIM coverage provided, in relevant part:

"Limit of Liability"

A. The limit of liability shown in the Declarations for "each person" is the most we will pay for all damages, including prejudgment and post-judgment interest, due to BI to any one person as a result of any one accident. This includes all damages sustained by any other person as a result of that BI. Subject to this limit for "each person", the limit shown in the declarations for "each accident" is the most we will pay for all damages, including prejudgment and post-judgment interest, arising out of BI sustained by two or more persons resulting from **any one accident**.

If a single limit is shown in the Declarations for "each accident" this is the most we will pay for **any one accident**. . . .

The limit of liability includes damages for care, loss of consortium, emotional distress, and loss of services or death.

This is the most we will pay regardless of the number of:

    1. insureds;

    2. claims made;

    3. vehicles shown in the Declarations;

    4. premiums shown in the Declarations; or

    5. vehicles involved in the accident.

(Emphasis added.)

[¶6] Based on the Policy language, MetLife deposited $300,000 with the district court in the underlying interpleader action, asserting that amount represented its full policy limits for the one accident that resulted in injuries to the Hursts. The Hursts disagreed and argued, instead, that policy limits were $600,000, in accordance with the Policy, as their injuries were a result of two accidents. The Policy did not define "one accident."

[¶7] After cross-motions for summary judgment were filed, the district court applied a legal doctrine known as the "cause theory" to conclude that only one (1) accident had occurred and, thus, MetLife's policy limit for UIM coverage was $300,000. This appeal by the Hursts followed.

## STANDARD OF REVIEW

[¶8] The parties agree, as does this Court, that a *de novo* standard of review applies for determining the grant of summary judgment. *See Blagrove v. JB Mech.*, 934 P.2d 1273, 1275 (Wyo. 1997). This Court affords no deference to the district court's ruling and, instead, reviews a "summary judgment in the same light as the district court, using the same materials and following the same standards." *Lindsey v. Harriet*, 2011 WY 80, ¶ 18, 255 P.3d 873, 880 (Wyo. 2011). When, as here, the district court resolved the case by the grant and denial of cross-motions for summary judgment, "both the grant and the denial of the motions for a summary judgment are subject to appeal" if the decision completely resolves the case. *Lindsey*, ¶ 18, 255 P.3d at 880 (quoting *Lieberman v. Wyoming.com LLC*, 11 P.3d 353, 356 (Wyo. 2000)).

## ANALYSIS

[¶9] The sole issue in this appeal revolves around the meaning of "any one accident," as contained in the Hursts' UIM coverage language in the Policy. That term is not defined therein.

### The Language of the Policy

[¶10] When summary judgment is based upon interpretation of an insurance policy, the rules of contract interpretation apply. *See St. Paul Fire and Marine Ins. Co. v. Albany County Sch. Dist. No. 1*, 763 P.2d 1255, 1258 (Wyo. 1988). "Interpretation of the contractual language is a matter of law for the court, provided the language is clear and unambiguous. If the language is not clear or there are other material issues of fact, summary judgment is not appropriate." *See N. Fork Land & Cattle, LLLP v. First Am. Title Ins. Co.*, 2015 WY 150, ¶ 10, 362 P.3d 341, 345 (Wyo. 2015) (internal citations omitted). *See also Thorkildsen v. Belden*, 2011 WY 26, ¶ 8, 247 P.3d 60, 62 (Wyo. 2011).

[¶11] As to the interpretation of an unambiguous contract, this Court previously has opined:

A trial court follows a familiar path when interpreting or construing a contract. The primary focus is on determining the intent of the parties to the contract. The initial question is whether the language of the contract is clear and unambiguous. **If it is, then the trial court determines the parties' intent from the contract language alone. It does not consider extrinsic evidence, although it may consider the context in which the contract was written, including the subject matter, the purpose of the contract, and the circumstances surrounding its making, all to help ascertain what the parties intended when they made the contract.** The trial court then enforces the contract in accordance with the plain meaning its language would be given by a reasonable person. All of these issues-deciding whether a contract is unambiguous, determining the parties' intent from the unambiguous language, and enforcing the contract in accordance with its plain meaning-involve questions of law for the trial court.

*Fox v. Wheeler Elec., Inc.*, 2007 WY 171, ¶ 10, 169 P.3d 875, 878 (Wyo. 2007) (emphasis added). *See also Miner v. Jesse & Grace, LLC*, 2014 WY 17, 317 P.3d 1124 (Wyo. 2014); *Hopkins v. Bank of West*, 2013 WY 129, ¶¶ 19-20, 311 P.3d 151, 157 (Wyo. 2013).

[¶12] The parties' intent is determined by considering the instrument that memorializes the parties' agreement as a whole. *See Doctors' Co. v. Ins. Corp. of Am.*, 864 P.2d 1018, 1023 (Wyo. 1993). "This court utilizes a standard of interpretation for insurance policies which declares that the words used are given the plain meaning that a reasonable person, in the position of the insured, understands them to mean." *Id.* Further, "[b]ecause insurance policies represent contracts of adhesion where the insured has little or no bargaining power to vary the terms, if the language is ambiguous, the policy is strictly construed against the insurer. . . . However, the language will not be 'tortured' to create an ambiguity." *N. Fork Land & Cattle, LLLP*, ¶ 14, 362 P.3d at 346.

[¶13] In determining the ambiguity, or lack thereof, of the term "accident," as provided in the Policy, consideration of the dictionary definitions of "accident," is appropriate:

an unforeseen and unplanned event or circumstance;

an unfortunate event resulting especially from carelessness or ignorance[.]

*Accident*, Merriam-Webster, https://www. merriam-webster.com/dictionary/accident.

"Event," likewise, is defined as:

"[a] phenomenon or occurrence located at a single point in space-time," The American Heritage Dictionary of the English Language (4th ed. 2006), and as "any incident, good or bad," Webster's Revised Unabridged Dictionary (2006).

*State Auto Prop. & Cas. Co. v. Matty*, 286 Ga. 611, 690 S.E.2d 614, 616 (2010). Yet, these definitions provide "a slender reed upon which to base a clear meaning of a contractual term." *Id.* They most certainly "do not dispense with the rule that contracts must be construed as a whole, or with the cardinal rule of construction, which is to ascertain the intent of the parties." *Id.* at 616–17 (internal citation omitted).

[¶14] Here, the parties agree that the language "any one accident" is unambiguous in terms of its *practical* meaning to a reasonable person in the position of the insured. Where the confusion lies is in its *legal* meaning vis-à-vis application of UIM benefit coverage and the determination of whether, in this particular instance, there was more than one (1) accident. To that extent, "interpretation of an insurance policy is a question of law." *Just v. Farmers Auto. Ins. Ass'n*, 877 N.W.2d 467, 471 (Iowa 2016) (citing *Greenfield v. Cincinnati Ins. Co.*, 737 N.W.2d 112, 117 (Iowa 2007)). This Court is called upon, then, to adopt a legal theory under which a definition of "one accident" may be derived.

### Legal Theories of Interpretation of "One Accident"

[¶15] There are three separate legal theories, or analytical approaches, that courts utilize to interpret the term "one accident," which appears to be standard insurance policy language: the cause theory, the effect theory, and the event theory. *See Am. Family Mut. Ins. Co. v. Wilkins*, 285 Kan. 1054, 179 P.3d 1104, 1111 (2008) ("Legal commentators have divided the tests for determining the number of occurrences into three catego-

ries: cause, effect, and event-triggering liability.").

[¶16] Under the "cause theory," adopted by an "influential majority of jurisdictions," *see Matty*, 690 S.E.2d at 618, "the number of accidents is determined by the number of causes of the injuries, with the court asking if '[t]here was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage.'" *Id.* at 617 (some internal quotation marks omitted) (quoting *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 61 (3d Cir. 1982)). *See Just*, 877 N.W.2d at 472–74; *Auto-Owners Ins. Co. v. Munroe*, 614 F.3d 322, 325–26 (7th Cir. 2010); *Washington v. McCauley*, 62 So.3d 173, 178, 184–85 (La. Ct. App. 2011); *Kan. Fire & Cas. Co. v. Koelling*, 729 S.W.2d 251, 252–53 (Mo. Ct. App. 1987); *Saint Paul Mercury Indem. Co. v. Rutland*, 225 F.2d 689, 690–91, 693 (5th Cir. 1955); *Am. Cas. Co. of Reading, Pa. v. Heary*, 432 F.Supp. 995, 997 (E.D. Va. 1977); *Hyer v. Inter-Ins. Exch. of Auto. Club of S. Cal.*, 77 Cal.App. 343, 246 P. 1055, 1057 (1926); *Bish v. Guar. Nat'l Ins. Co.*, 109 Nev. 133, 848 P.2d 1057, 1058 (1993) (per curiam); *Truck Ins. Exch. v. Rohde*, 49 Wash.2d 465, 303 P.2d 659, 660–61, 664 (1956) (en banc); *Olsen v. Moore*, 56 Wis.2d 340, 202 N.W.2d 236, 238, 241 (1972). *See also* 7A Am. Jur. 2d *Automobile Insurance* § 431, Westlaw (database updated August 2017); 12 Steven Plitt, et al., *Couch on Insurance 3d* § 170:7, Westlaw (database updated June 2017).

[¶17] Pursuant to this legal theory, "[if] one cause is interrupted and replaced by another intervening cause, then the chain of causation is broken, resulting in two or more occurrences depending on the number of intervening causes." *Wilkins*, 179 P.3d at 1111. "When collisions between multiple vehicles are separated by a period of time or the insured maintains or regains control of the vehicle before a subsequent collision, there are multiple occurrences." *Id.* at 1114. *See also Just*, 877 N.W.2d at 472–74.

[¶18] As recognized by the *Just* court:

Under the cause theory, courts have determined that more than one accident occurred when an intervening cause demar-

cated the collisions. *See Banner v. Raisin Valley, Inc.*, 31 F.Supp.2d 591, 593–94 (N.D. Ohio 1998). For instance, if the driver maintained or regained control of his or her vehicle before going on to hit a second car (or to hit the first again), the collisions can be deemed separate accidents. *See Liberty Mut. Ins. Co. v. Rawls*, 404 F.2d 880, 880–81 (5th Cir. 1968) (per curiam) (finding that two accidents occurred for purposes of liability limit where the insured struck two vehicles with a five-second interval between the collisions while fleeing from law enforcement because there was no evidence that the insured lost control of his vehicle); *Amberge v. Lamb*, 849 F.Supp.2d 720, 721–22, 726 (E.D. La. 2011) (finding that four separate accidents occurred where driver impacted other vehicle "at four distinct points in time" and driver had maintained control of his vehicle throughout the impacts); *Ill. Nat'l Ins. Co. v. Szczepkowicz*, 185 Ill. App.3d 1091, 134 Ill.Dec. 90, 542 N.E.2d 90, 93 (1989) (finding that two accidents had occurred where five minutes elapsed between impacts and negligent driver had moved his vehicle but left it blocking the road after the first collision). As part of this analysis, courts examine the time and space interval between the collisions. *Welter v. Singer*, 126 Wis.2d 242, 376 N.W.2d 84, 87 (Ct. App. 1985) ("If cause and result are so simultaneous or so closely linked in time and space as to be considered by the average person as one event, courts adopting the 'cause' analysis uniformly find a single occurrence or accident."); *see Banner*, 31 F.Supp.2d at 593–94 (collecting cases). *Just*, 877 N.W.2d at 473–74.

[¶19] Under the second alternative, the "effect theory," an approach utilized by a minority of the courts, the court considers the number of accidents from the perspective of the injured parties. *See Zurich Am. Ins. Co. v. Goodwin*, 920 So.2d 427, 432–33 (Miss. 2006). "[U]nder the effect test, the policy coverage limits are based on the effect of the accident, extending the insured's policy limits to each injured party." *Wilkins*, 179 P.3d at 1111 (citing *See, e.g., Anchor Casualty Co. v. McCaleb*, 178 F.2d 322, 324–25 (5th Cir. 1949) (concluding that each property owner damaged by a series of oil rig explosions was entitled to the $5,000 per accident limit)). The effect theory has been criticized as not giving effect to the intent of the contracting parties. *See Amish Connection, Inc. v. State Farm Fire & Cas. Co.*, 861 N.W.2d 230, 236 (Iowa 2015).

[¶20] Under the third approach, the "event theory," the court considers the "number of events" that happened. *See Just*, 877 N.W.2d at 475–76; *National Liability & Fire Insurance Co. v. Itzkowitz*, 624 Fed.Appx. 758, 763 (2d Cir. 2015); *Hartford Accident & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 350 N.Y.S.2d 895, 305 N.E.2d 907, 909–10 (1973). Under this theory, an accident or occurrence equates with the liability-triggering event, regardless of the details of how or why the event happened. *See Shamblin v. Nationwide Mut. Ins. Co.*, 175 W.Va. 337, 332 S.E.2d 639, 644 (1985). Courts adopting this theory conclude that the term "accident" "could refer to the event, *i.e.*, 'the unintended and unexpected loss or hurt apart from its cause'; and in still other cases, it could refer to both the event and the cause." *Wilkins*, 179 P.3d at 1112. Thus, the liability-triggering event test is a narrow class that can overlap with the cause test under certain circumstances. *Id.* Those critical of the event theory note: "The event theory, however, seems problematic … because it is not clear how the 'event' concept advances the analysis. Is event just another word for accident?" *Just*, 877 N.W.2d at 475–76.

### Adoption of the Cause Theory in Wyoming

[¶21] Here, as a matter of first impression, the district court adopted and applied the majority view, the cause theory, to determine the number of accidents at issue. The Hursts argue, in the alternative, either that the effect theory is the more appropriate test or that, if the cause theory is adopted, the district court misapplied that test under these circumstances. Although the Hursts make compelling arguments for the adoption of the effect theory in the application of solely UIM benefits, this Court finds the effect theory particularly problematic in its application to liability coverage for the same reasons expressed by the district court. One might con-

sider a dual approach: application of the cause theory in liability coverage situations and application of the effect theory in UIM coverage situations. However, the Policy makes no distinction between the definition of "one accident" in the context of its liability coverage as compared to its UIM coverage. This Court, then, cannot justify applying varying definitions depending on the nature of the accident and whether the insured is the tortfeasor or the innocent injured party. To do so would be contrary to the language of the Policy.

■ [¶22] Ultimately, this Court agrees that the cause theory is the appropriate test upon which to determine the issue of the number of accidents that occurred for insurance liability. The rationale therefor is well expressed by the *Matty* court:

"An influential majority of jurisdictions has adopted" the theory, and it "is consonant with the method of computation of [insurance] rates by sound rating organizations." Ohlsson at § 2.05[3]. In this regard, the *Rutland* court, in rejecting the effect theory, recognized that the word "accident" appeared in the limits-of-liability section of the policy and explained that

[m]anifestly, it was intended that the policy have monetary limits of coverage; but consideration of the amount stated in relation to the claimants damaged rather than the event causing the damage would make the policy potentially limitless. Moreover, it is well known that the premium rates for liability insurance are based upon the risk insured and the potential amounts of liability covered. Such a system of computing rates is simply incompatible with the idea of virtually limitless liability depending solely upon the number of claimants.

*Rutland*, 225 F.2d at 693.

Because the effect theory determines the number of accidents by the number of persons who sustained injuries (and the number of vehicles or other property that sustained damage), it has sometimes been called the "windfall" theory, has been said to violate "common sense," and "has not been applied to automobile liability cases, perhaps because automobile accidents are more easily understood than cases involving damage to realty." Ohlsson at 2.05[3][b]. Its rejection has therefore been encouraged. *Id.*

The cause theory corroborates the intent of the parties to the insurance contract in this case. As previously noted, the term "each accident" appears in the limitation of liability section of the State Auto policy, which clearly contemplates that there can be a single "accident" in which there are multiple vehicles, injured parties, and claims and provides that for that type of single accident, there will be a liability limit of $100,000. By contrast, the effect theory, by defining accident in terms of the number of people injured and items of property damaged, would mean that there can never be one accident and a $100,000 limit of liability in a multiple vehicle collision in which several persons are injured or vehicles damaged, or even in cases where the insured's vehicle collides with only one other vehicle and there are several people in that one vehicle who are injured. As with the claimants' proposed definition of the word "accident," the effect theory would relegate the contract's liability limit to near surplusage, applying only to accidents involving one vehicle and one passenger, while subjecting the insurer to unpredictable and potentially enormous liability in numerous cases. See *Greaves v. State Farm Ins. Co.*, 984 F.Supp. 12, 16 (D.D.C. 1997); *Rutland*, 225 F.2d at 692. If the word "accident" were intended to apply to each person injured and item of property damaged in an accident, the policy would simply have read that the limit of liability was $100,000 "for each person injured or item of property damaged."

Finally, the cause theory is more consistent with Georgia tort law than the effect and event theories, recognizing that liability insurance is designed to cover damages for the torts of the insured. Under our tort law, it is well settled that "no liability attaches unless the negligence alleged is the proximate cause of the injury sustained." *Harrison v. Jenkins*, 235 Ga. App. 665, 510 S.E.2d 345 (1998). Defining the number of separate "accidents" in terms of

the number of separate "causes" is consistent with this rule. Several of the seminal cases that adopted the cause theory for construing the term "accident" employ this reasoning:

> The insured and the insurer intended by this contract to indemnify the insured's tort liability to third persons. Such liability arises from a negligent act on the part of the insured which is the proximate cause of an injury. The absence of proximate cause precludes tort liability. Proximate cause is an integral part of any interpretation of the words "accident" or "occurrence," as used in a contract for liability insurance which indemnifies the insured for his tortious acts.

*Truck Ins. Exchange v. Rohde*, 49 Wash.2d 465, 303 P.2d 659, 663 (1956). See also Ohlsson at § 2.05[3][a] (citing *Hyer v. Inter-Insurance Exchange of the Automobile Club of Southern California*, 77 Cal. App. 343, 246 P. 1055, 1057 (1926)).

*Matty*, 690 S.E.2d at 618–19. This Court agrees that the cause theory corroborates the intent of the parties to the insurance contract and is more consistent with tort law principles and hereby adopts the same in Wyoming.

### Interpretation as Consistent with Intent of the Policy and Public Policy Behind Uninsured Motorist Insurance (UIM) Coverage

[¶23] Finally, it should be noted that adoption of the cause theory, and its application in this case herein, are consistent with both the purpose and intent of this Policy, as well as the overall public policy behind UIM insurance benefits.

[¶24] The district court was concerned that adoption of the effect theory, as urged by the Hursts, effectively would remove "the actual cap on the insurance by allowing for a nebulous cap to be inserted in its place, based on the number of injured parties, collisions or claimants." The district court also viewed the effect theory as "problematic and non-intuitive" in its application and stated that the theory "is rarely, if ever, applied in auto insurance cases...."

[¶25] Overall, the intent of *liability* insurance coverage is that "[t]he insured and the insurer intended by th[e] contract to indemnify the insured's tort liability to third persons." *Just*, 877 N.W.2d at 474 (emphasis omitted). Thus, the "purpose of liability coverage" is to limit liability. *Id.* (citing *Rohde*, 303 P.2d 659). However, "U[I]M insurance is a form of casualty, rather than liability insurance." *Ulrich v. United Servs. Auto. Ass'n*, 839 P.2d 942, 947 (Wyo. 1992). The "social function of insurance coverage" is to "provid[e] compensation for injuries sustained by innocent members of the public." *Century Sur. Co. v. Jim Hipner, LLC*, 2016 WY 81, ¶ 12, 377 P.3d 784, 790 (Wyo. 2016). Even more poignantly, "it is apparent that the purpose of uninsured-motorists insurance coverage is to provide to innocent automobile accident victims an *opportunity* to procure a means of insulating themselves from damages incurred as a result of unfortunate and far too frequently occurring automobile collisions with uninsured motorists." *Commercial Union Ins. Co. v. Stamper*, 732 P.2d 534, 537 (Wyo. 1987) (italics in original). In sum, there is a recognizable difference behind the parties' intent when entering into the liability coverage of the policy as compared to the uninsured motorist (UIM) provisions therein.

[¶26] Under the Hursts' Policy, MetLife never was exposed to potential unlimited third-party liability in the facts of this case, as was the concern of the district court, where the UIM provision of the Policy applied only to its insureds, the Hursts. Its liability was capped at two persons, looking only to how many accidents were involved. The application of the cause theory and a case-specific factual consideration as to how many accidents were at issue are in accord with the public policy behind UIM insurance coverage, a creature distinct and unique from liability coverage, while still recognizing the overall intent of these parties with respect to appropriately limiting MetLife's liability under the Policy. The result is equitable and consistent with this Court's historical interpretation of insurance policies.

### Application of the Cause Theory to the Hursts

[¶27] The district court concluded that, pursuant to the cause theory, only one (1)

accident occurred for purposes of interpreting Policy limits. In reaching this conclusion, the district court focused on temporal and spatial considerations, noting that Terry's two impacts with the Hursts' bicycles occurred approximately thirty (30) feet and roughly one (1) second apart. The Court did not give much, if any, consideration to the notion of Terry's control of her vehicle. However, the element of control has a significant, if not overriding, impact on the determination of whether there is more than one accident, for without which there can be no single proximate, uninterrupted, and continuing cause.

[¶28] As summarized by a Louisiana court:

> These cases, and the parties' arguments, make clear that **the element of "control" is essential** to determining whether there was a single accident or more. Where a person loses control of the trajectory of his vehicle and strikes more than one person or vehicle, a court is more likely to find only one accident.

*Amberge v. Lamb*, 849 F.Supp.2d 720, 725 (E.D. La. 2011) (emphasis added). "When collisions between multiple vehicles are separated by a period of time or the insured **maintains or regains** control of the vehicle before a subsequent collision, there are multiple occurrences." *Wilkins*, 179 P.3d at 1114 (emphasis added). *See also Olsen*, 202 N.W.2d 236; *Rohde*, 303 P.2d 659; *Illinois Nat. Ins. Co. v. Szczepkowicz*, 185 Ill.App.3d 1091, 134 Ill.Dec. 90, 542 N.E.2d 90, 92 (1989); *Liberty Mut. Ins. Co. v. Rawls*, 404 F.2d 880 (5th Cir. 1968). Thus, application of the cause theory requires consideration of three elements: (1) temporal (time between events/injuries); (2) spatial (distance between events/injuries); and (3) dominion/control (whether the driver maintained or regained control of the vehicle between events/injuries) to determine whether there was a single proximate, uninterrupted, and continuing cause of the injuries sustained.

[¶29] Here, the stipulated facts reveal that the collisions with Larry Hurst and Sara Hurst could be separate incidents, each arising out of Terry's independent collision with each of the Hursts, riding his/her own, separate bicycle. There was no chain reaction or causal connection between the impact with Larry Hurst's bicycle and Sara Hurst's bicycle; nothing that necessitated an impact of the latter by virtue of the impact with the former, *so long as* Terry was in control of her vehicle at the time. The events occurred approximately thirty (30) feet away from each other and approximately one (1) second apart from each other.

[¶30] The parties agreed to be bound by the stipulated facts presented to the district court. As MetLife noted in its brief, "The record is void of any evidence such as debris in the road, brake marks, skid marks, swerving, obstacles that impacted Terry's ability to have control of the minivan." An inference could well be made, then, that Terry "was in control of the vehicle enough to make deliberate decisions about how and where to drive it," *Amberge*, 849 F.Supp.2d at 726, and maintained control over her vehicle throughout these consecutive events. However, this Court is not permitted to make such inferences in a grant of summary judgment in favor of the Hursts. Rather, the law requires that this Court examine the materials in the record "from the vantage point most favorable to the nonmoving party opposing the motion, giving that party the benefit of all favorable inferences which may fairly be drawn from the materials." *Bangs v. Schroth*, 2009 WY 20, ¶ 20, 201 P.3d 442, 452 (Wyo. 2009). While the stipulated facts provide no evidence that Terry lost control of her vehicle, and no indication that she lost control after hitting Larry Hurst and before hitting Sara Hurst, they also provide no evidence to allow this Court to conclude that Terry maintained or regained control of her vehicle throughout this duration—at least requiring this Court to draw improper inferences. The proper inferences must be made by the trier of fact at trial.

[¶31] Taking the stipulated facts as a whole, affording MetLife the benefit of all favorable inferences that may fairly be drawn from those limited facts, and applying them to the elements of the cause theory, as now adopted in Wyoming, this Court concludes that the stipulated facts are inconclu-

sive regarding Terry's control of her vehicle. The matter must be remanded for trial.

### CONCLUSION

[¶32] While, in recognizing the cause theory, the trial court adopted the correct legal doctrine for the interpretation of the "one accident" language in the Policy, the record supports the conclusion that there is insufficient factual development for a thorough consideration of the "control" element required by the cause theory. The trial court's finding that there was one (1) accident is reversed. This matter is remanded to the district court for further proceedings in accordance with this opinion.