**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 27, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

INTERSTATE FIRE & CASUALTY
COMPANY,

  Plaintiff - Appellant,

v.

APARTMENT MANAGEMENT
CONSULTANTS LLC,

  Defendant - Appellee.

No. 18-8058
(D.C. No. 2:13-CV-00278-ABJ)
(D. Wyo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **LUCERO**, and **McHUGH**, Circuit Judges.
_____

Interstate Fire & Casualty Company ("Interstate") appeals the district court's

grant of summary judgment in favor of Apartment Management Consultants, Inc.,

("AMC") declaring that Interstate must provide insurance coverage and indemnify

AMC under Interstate's primary and excess insurance policies for compensatory and

punitive damages adjudged in an underlying lawsuit against AMC.  Exercising

jurisdiction under 28 U.S.C. § 1291, we affirm.

_____

[*] This order and judgment is not binding precedent except under the doctrines
of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

**I**

This case involves a dispute over who must pay a $1,950,000 punitive damages award to Amber Lompe. Lompe was a young college student living in an apartment managed by AMC in Casper, Wyoming, when she was injured by a malfunctioning furnace in her apartment that exposed her to carbon monoxide gas. See Lompe v. Sunridge Partners, LLC, 818 F.3d 1041, 1047, 1076 (10th Cir. 2016). She prevailed in a lawsuit against her landlord, Sunridge Partners, LLC ("Sunridge"), and its management company, AMC, and was awarded $3,000,000 in compensatory damages and $25,500,000 in punitive damages, of which $22,500,000 was allocated against AMC.[1] Id. at 1046.

Interstate provided primary and excess liability insurance coverage[2] to AMC and Sunridge. First, Interstate issued a general liability insurance policy ("Policy" or "Primary Policy") to Commercial Industrial Building Owner's Alliance, Inc. ("CIBA") with $1 million per occurrence and $2 million aggregate policy limit for

---

[1] The jury reduced the $3,000,000 compensatory damages award by 10% to $2,700,000 to reflect Lompe's share of fault for her injury, allocating $1,950,000 of the remainder to AMC and $750,000 to Sunridge. Id. at 1053. Compensatory damages are not at issue in this appeal. In the 2016 appeal, we vacated the punitive damage award against Sunridge, which is not a party to this appeal, and reduced the award against AMC to $1,950,000, which is the amount in dispute in this appeal.

[2] "[P]rimary insurance potentially attaches immediately upon the happening of an occurrence or accident that gives rise to liability on the part of the insured"; whereas excess insurance "is secondary insurance coverage that attaches only after a predetermined amount of primary insurance . . . has been exhausted." Scott M. Seamana & Charlene Kittredge, Excess Liability Insurance: Law and Litigation, 32 Tort & Ins. L.J. 653, 655-56 (1997); see also Union Indem. Ins. Co. v. Certain Underwriters, 614 F. Supp. 1015, 1017 (S.D. Tex. 1985).

the period at issue. CIBA, in turn, issued Certificates of Insurance to AMC and

Sunridge as named insureds. This policy contained an explicit exclusion for punitive

or exemplary damages.[3] Next, Interstate issued an Excess Liability Policy ("Excess

Policy") with a $10 million per occurrence and $10 million aggregate limit, listing

CIBA, AMC, and Sunridge as named insureds. The Excess Policy followed the form

of the underlying Primary Policy,[4] but did not include a specific punitive damages

exclusion.

---

[3] The Primary Policy states:

EXCLUSION - PUNITIVE OR EXEMPLARY DAMAGES

This endorsement modifies Insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS COVERAGE PART

This insurance does not apply to fines, penalties, punitive damages,
exemplary damages, treble damages or the multiplication of
compensatory damages.

[4] A "following form" excess insurance policy "incorporates by reference the
terms, conditions, and exclusions of the underlying policy." Douglas R. Richmond,
Rights and Responsibilities of Excess Insurers, 78 Denv. U. L. Rev. 29, 30 (2000).
"An excess policy that follows form is designed to match the coverage provided by
the underlying policy . . . ." Id. The "follows form" provision of Interstate's Excess
Policy states:

The definitions, terms, conditions, limitations, exclusions and
warranties contained in the "underlying insurance" polic(ies) that are in
effect at the inception date of this policy apply to this policy unless they
are inconsistent with provisions of this policy, or relate to premium,
subrogation, other insurance, an obligation to investigate or defend, the
amount or limits of insurance, payment of expenses, cancellation or any
renewal agreement.

3

Lompe filed her complaint against Sunridge and AMC on May 2, 2012, and Interstate assumed the defense of Lompe's claim on May 12, 2012. Although Lompe's complaint sought punitive damages at its inception, Interstate did not reserve its right to disclaim coverage for punitive damages until November 20, 2013—eighteen months after the complaint was filed, one month after the district court denied AMC and Sunridge's motion for summary judgment, and just eleven days before the jury trial began. Further, in the summary judgment briefing, the counsel retained by Interstate on behalf of AMC and Sunridge advanced only a single-sentence argument to dismiss the punitive damages claim as a matter of law: "A claim for punitive damages is not a separate cause of action and cannot stand without an underlying claim."

During the eighteen-month period between Lompe filing her complaint and Interstate's reservation of its rights, Lompe made a clear and unequivocal offer to settle within the limits of the Primary Policy. AMC made three separate demands that Interstate settle the case, but Interstate refused. After trial, the jury awarded Lompe compensatory damages above the limits of the primary policy as well as significant punitive damages. Interstate provided counsel for AMC and Sunridge to appeal the jury verdict, and on appeal we vacated the punitive damages award against

---

If any "underlying insurance" does not pay a loss, for reasons other than exhaustion of an aggregate limit of insurance, then we will not pay such loss.

4

Sunridge and reduced the punitive damages award against AMC to $1,950,000. Lompe, 818 F.3d at 1046.

On December 24, 2013, two days before judgment was entered in the underlying Lompe action against AMC and Sunridge, Interstate sued for relief under 28 U.S.C. § 2201, seeking a declaration that Interstate had no coverage obligation under either the Primary Policy or the Excess Policy "concerning any award of punitive damage, and no duty to indemnify either AMC or Sunridge for any punitive damages awards in the Lompe Action." Interstate subsequently moved for judgment on the pleadings, and AMC cross-moved for partial summary judgment, asking the court to find that Interstate was estopped from relying on the Primary Policy's punitive damages exclusion. In opposition to AMC's summary judgment motion, Interstate argued that: (1) estoppel was inapplicable, (2) that AMC had failed to show prejudice, and (3) that a ruling on the issue would be premature. The district court disagreed and held that Interstate was estopped from relying on the Primary Policy's punitive damages exclusion because Interstate unconditionally assumed the defense of AMC and did not reserve its right to disclaim coverage until shortly before trial. As a result, the court determined that "Interstate under the Primary Policy must provide coverage and indemnification, having failed to defend with a timely reservation of rights, for sums the insured is legally obligated to pay."

Next, the district court held that, because the Excess Policy did not include a specific exclusion for punitive damages, once the policy limits of the Primary Policy were exhausted, "the excess insurers' obligations are triggered and they must provide

5

the agreed-upon excess liability coverage." Interstate's obligation under the Primary Policy to provide coverage and indemnification for the damages owed to Lompe—both punitive and compensatory—were damages that the insured was "legally obligated to pay." As a result, absent a specific exclusion within the Excess Policy, Interstate was required to provide the agreed-upon excess liability coverage. After further proceedings not relevant here, the district court reiterated its findings and entered judgment for AMC on the coverage and indemnification issue.[5] Interstate appealed to challenge the district court's ruling that it was estopped from denying coverage to AMC.

## II

"We review de novo the district court's grant of summary judgment and apply the same legal standard used by the district court." Cornhusker Cas. Co. v. Skaj, 786 F.3d 842, 849 (10th Cir 2015) (quotation omitted). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material

---

[5] In its July 2018 order the district court held:

[T]hat Interstate under the Primary Policy must provide coverage and indemnification, having failed to defend with a timely reservation of rights, for all sums the insureds are legally obligated to pay, which encompasses compensatory and punitive damages. If policy limits under the Primary Policy are exhausted, the excess insurers' obligations are triggered under the applicable "follow form" policies and the excess insurers must provide the agreed-upon excess liability coverage. The excess policies contain no specific exclusion that is applicable to facts here. Interstate and the excess insurers (if necessary) must provide coverage and indemnification, as previously ordered. (footnote omitted).

6

fact and the movant is entitled to judgment as a matter of law." Id. at 850 (quoting Fed. R. Civ. P. 56(a)). "We examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party." Berry & Murphy, P.C. v. Carolina Cas. Ins. Co., 586 F.3d 803, 808 (10th Cir. 2009) (quotation omitted).

"Because this is a diversity action, we apply the substantive law of the forum state, which, for purposes of this appeal, is Wyoming. In addition, we review the district court's interpretation and determination of state law de novo." Cornhusker, 786 F.3d at 850 (citation and quotation omitted).

### III

Interstate contends that the district court erred when it found that Interstate was equitably estopped from denying coverage because it assumed the defense of the underlying Lompe action without timely reserving its rights. Interstate asserts that equitable estoppel is not available to expand insurance coverage under Wyoming law and that the district court erroneously applied the doctrine. Finally, Interstate argues that the district court erred when it determined that Interstate was liable under the Excess Policy for any portion of the punitive damages award.

### A

Interstate agrees with the district court's statement of the general rule under Wyoming law that "estoppel and waiver cannot be employed to expand policy coverage." It contends, however, that the court erred by recognizing an exception to this default rule when an insurer—with full knowledge of noncoverage under the

7

policy—assumes defense of a claim without reserving its right to deny coverage under an existing exclusion. Interstate replows the same legal ground we considered in Cornhusker to no avail—that decision controls this question.[6]

As we have explained, "[i]n cases arising under a federal court's diversity jurisdiction, the task of the federal court is not to reach its own judgment regarding the substance of the common law, but simply to ascertain and apply the state law." Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003) (quotation omitted). When a federal court predicts what a state's highest court would do, it is "performing [a] ventriloquial function . . . . Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue." Id. Interstate points to no such intervening cases, nor have we discovered any.

In Cornhusker, we recognized that "[t]he Wyoming Supreme Court has not addressed whether an insurer, having previously assumed the defense of an action without a reservation of rights, may subsequently be estopped from asserting the defense of noncoverage." Id. at 852. To formulate our best Erie-guess on what the Wyoming Supreme Court would decide, we evaluated our own precedent, other

_____

[6] Interstate's motion to certify questions to the Wyoming Supreme Court is denied. See Cornhusker, 786 F.3d at 852 ("Under our own federal jurisprudence, we will not trouble our sister state courts every time an unsettled legal question in a diversity action comes across our desks. When we see a reasonably clear and principled course, we will seek to follow it ourselves.") (quotation and alterations omitted).

8

federal precedent to determine the "general weight and trend of authority," and Wyoming case law. Id. at 852–54. After this extensive analysis, we concluded that the Wyoming Supreme Court would recognize and apply an exception to the default rule under the facts in Cornhusker. Id. at 854-55.

Cornhusker considered and rejected the fundamental premise Interstate advances in this appeal—that under Wyoming law equitable estoppel cannot be employed to expand policy coverage. Id. at 855-57. Key to this was an examination of Pendleton v. Pan American Fire and Casualty Co., 317 F.2d 96 (10th Cir. 1963), and Braun v. Annesley, 936 F.3d 1005 (10th Cir. 1991), as well as Wyoming case law concerning its default rule and equitable estoppel. In Cornhusker, we discussed Pendleton's consideration of an equitable-estoppel exception to the general rule against expansion of insurance coverage under New Mexico law. We explained that this exception applies when:

> a liability insurance carrier, which assumes and conducts the defense of an action . . . with knowledge of a ground of forfeiture or noncoverage under the policy, and without disclaiming liability or giving notice of a reservation of its right to deny coverage, is thereafter precluded in an action upon the policy from setting up the ground of forfeiture or noncoverage as a defense. In other words, the insurer's unconditional defense of an action . . . constitutes a waiver of the terms of the policy and an estoppel of the insurer to assert the defense of noncoverage. . . . It is not necessary for the defended party to show prejudice in such a situation because he is presumed to have been prejudiced by virtue of the insurer's assumption of the defense.

Cornhusker, 786 F.3d at 852-53 (quoting Pendleton, 317 F.2d at 99) (alterations adopted). We also noted that we had applied the same exception in Braun under

9

Oklahoma law despite Oklahoma's rule that "estoppel cannot be used to create a contract." Id. at 854; see also Braun, 936 F.3d at 1110–11. Further explaining the underlying rationale for applying the exception, we wrote:

> [I]n Pendleton we concluded that the insurer was estopped from denying coverage to the ostensible insured by its conduct in unconditionally assuming the defense without a reservation of rights, and that prejudice was presumed to flow from the insurer's actions. . . . Notably, we reached this conclusion notwithstanding our agreement with the insurer that there was not in fact coverage under the policy. . . . We seemed to reason that, irrespective of the actuality of noncoverage, the insurer must accept the equitable consequences of its deliberate choice to assume full control of the litigation, without a reservation of rights, because the ostensible insured was induced to, and did, relinquish control of his defense . . . to the insurer. And those equitable consequences involved shouldering the burdens of any liability arising from the litigation that it deliberately elected to control.

Cornhusker, 786 F.3d at 853 (emphasis added) (citations and quotations omitted). We concluded, "insurers should bear a specific consequence of such conduct: viz., they should be estopped from later denying coverage to an ostensible insured to escape liability stemming from litigation over which they deliberately assumed control without a reservation of rights." Id. at 854. In so concluding, we also recognized that the relinquishment of control over the defense was inherently prejudicial to the defendant if the reservation of rights was untimely. Id. at 853. Because Cornhusker specifically decided the legal issue raised by Interstate in this appeal, the district court did not err when it followed Cornhusker to apply a Pendleton-type estoppel exception to Wyoming's general rule.

The district court correctly determined that the facts here exemplify the concerns that animated the equitable-estoppel exception applied in Pendleton, Braun,

10

and Cornhusker. In its order, the district court held that AMC was "lulled into a false sense of security when Interstate defended without a reservation of rights, although it could have made an explicit reservation of rights and agreed to provide a conditional defense as early as May of 2012." This is apparent from the facts. Shortly after AMC notified and tendered the defense of the Lompe claim to Interstate in May 2012, Interstate unconditionally assumed the defense of the case and hired counsel to defend AMC and Sunridge. Throughout 2012 and 2013 Interstate did not reserve its rights to deny coverage based on the punitive damage exclusion in the Primary Policy, despite being on clear notice that Lompe's suit sought punitive damages. In March 2013, counsel filed a motion for summary judgment on all claims, including Lompe's punitive damages claims. However, rather than mount a full-bore assault on the claims for punitive damages under Wyoming law, which creates significant obstacles for obtaining a punitive damages award,[7] counsel moved for their dismissal with a one-sentence argument: "A claim for punitive damages is not a separate cause of action and cannot stand without an underlying claim."

---

[7] For example, counsel did not argue in his motion that Wyoming law disfavors punitive damages, allowing them only "in circumstances involving outrageous conduct, such as intentional torts, torts involving malice and torts involving willful and wanton misconduct"; Mayflower Rest. Co. v. Griego, 741 P.2d 1106, 1115 (Wyo. 1987); see also id. ("Punitive damages are not a favorite of the law and are to be allowed with caution within narrow limits."), nor that "punitive damages are not appropriate in circumstances involving inattention, inadvertence, thoughtlessness, mistake, or even gross negligence," id. (quotation omitted). Counsel also did not so much as mention that under Wyoming law "punitive damages are to be awarded only for conduct involving some element of outrage, similar to that usually found in crime." Cramer v. Powder River Coal, LLC, 204 P.3d 974, 979 (Wyo. 2009).

11

Only after the district court denied AMC's motion for summary judgment did Interstate send a belated reservation of rights to disclaim coverage based on the punitive damages exclusion in the Primary Policy: eighteen and one-half months after the lawsuit began and only eleven days before the jury trial commenced. Interstate argues that because AMC knew of the punitive damages exclusion no prejudice resulted from its belated reservation of rights. But this argument ignores the inherent nature of the prejudice that results from relinquishing control of the defense to the insurer. As the district court found, even if punitive damages were discussed in correspondence between Interstate and AMC, AMC did not know Interstate's intentions concerning reliance on the punitive damages exclusion.

Though the facts here differ slightly from those in Cornhusker—where the insurance company waited to disclaim coverage until sixteen months after default judgment had been entered—the prejudice is the same. Id. at 848-49. In Cornhusker, we concluded that the insurance company's delayed disclaimer of coverage

> had the effect of lulling [the ostensible insured] into the belief that Cornhusker was representing him pursuant to the Policy. Cornhusker specifically retained counsel to represent him in state court and subsequently rendered a defense. During that time period, when Cornhusker had a plausible basis for reserving its rights . . . , it never took that critical step.

Id. at 855. In this case, it is uncontested that Interstate failed to reserve its rights until eleven days before trial, past the point where AMC could have hired independent counsel to represent its interests on the purportedly uncovered claims, have them dismissed as a matter of law at summary judgment, or to attempt to settle

12

them prior to trial.  Both Cornhusker and this case implicate the same prejudice that, as Pendleton recognized, flows when an ostensible insured "relinquish[es] control of his defense . . . to the insurer."  Id. at 853; see also Pendleton, 317 F.2d at 99.  And, as recognized by the district court, "the prejudice to AMC . . . in these circumstances cannot be missed and is writ large in the Judgment against the two defendants in the Lompe action."[8]  We see no error in the district court's determination of prejudice or its order requiring Interstate to "shoulder[] the burdens of any liability arising from the litigation that it deliberately elected to control."  Cornhusker, 786 F.3d at 853; see also Boston Old Colony Ins. Co. v. Lumbermens Mut. Cas. Co., 889 F.2d 1245, 1248 (2d Cir. 1989) ("In our view, notice [disclaiming liability] first provided on the verge of trial . . . is untimely and prejudicial as a matter of law.").[9]

---

[8] Similarly, in its July 2018 order, the district court clearly articulated the prejudice to AMC:  "The facts that remain before this Court disclose that Interstate controlled the defense of this litigation in its entirety through trial to the prejudice of AMC and Sunridge, knowing that the policy contained language excluding coverage for punitive damages and notwithstanding AMC's and Sunridge's several demands to settle the litigation within the primary policy limits."

[9] We similarly reject Interstate's assertion that the district court's citation to Doctors' Co. v. Ins. Corp. of Am., 864 P.2d 1018 (Wyo. 1993), indicates that it failed to distinguish between promissory estoppel, which it acknowledges is permissible under Wyoming law, and equitable estoppel, which it asserts is not.  The district court's order clearly shows it was analyzing AMC's claims under the equitable estoppel doctrine recognized in Cornhusker.  Interstate's contention that the district court erred in its prejudice analysis is equally without merit.  In its equitable estoppel analysis, the district court clearly recognized the specific prejudice to AMC caused by Interstate's late reservation of rights and correctly determined that it arose from the relinquishment of control of the defense during the relevant time frame when AMC could have protected its interests.  As it recognized, "It is equally plain that Interstate exercised full control of the Lompe litigation, even to the extent that it refused to settle within the policy limits contrary to the insureds' repeated requests to

13

**B**

Interstate also argues that the district court erred when it found that Interstate had a duty to reserve its rights under the Excess Policy. But the district court made no such finding. Instead, the district court determined that because Interstate had failed to timely reserve its rights to disclaim coverage under the Primary Policy, it was required to provide coverage and indemnification for the damages owed to Lompe—both punitive and compensatory. These were damages that the insured was "legally obligated to pay" under the Primary Policy. As to the excess coverage, the district court determined that after the limits of the Primary Policy were exhausted, the excess insurers' obligations were triggered and "they must provide the agreed-upon excess liability coverage." The district court held that because the Lompe judgment exhausted coverage under the Primary Policy, Interstate, as the first level excess insurer, was required to provide coverage pursuant to the Excess Policy for amounts in excess of the underlying Primary Policy limits. We agree.

Under Wyoming law, "[w]hen summary judgment is based upon interpretation of an insurance policy, the rules of contract interpretation apply." Hurst v. Metro Prop. & Cas. Ins. Co., 401 P.3d 891, 895 (Wyo. 2017). "Interpretation of the contractual language is a matter of law for the court, provided the language is clear and unambiguous." Id. "The language of an insurance policy is ambiguous if it is capable of more than one reasonable interpretation." N. Fork Land & Cattle, LLLP

---

do so." These determinations only underscore the prejudice suffered by AMC in the relinquishment of its control of the defense to Interstate.

14

v. First Am. Title Ins. Co., 362 P.3d 341, 346 (Wyo. 2015) (quotation omitted).

Finally, "[b]ecause insurance policies represent contracts of adhesion where the

insured has little or no bargaining power to vary the terms, if the language is

ambiguous, the policy is strictly construed against the insurer."  Hurst, 401 P.3d at

895 (quotation omitted).

The Excess Policy coverage language states:

I. EXCESS INSURING AGREEMENT
Subject to the other provisions of this policy, we will pay on behalf of
any "insured", the "insured's" "ultimate net loss" if such loss arises
from:
a. Injury or damage that occurs; or
b. An offense committed
during our Policy Period and is insured by "underlying insurance"
designated in the Schedule of Underlying Insurance in ITEM SIX of the
Declarations.

The insurance afforded by this policy will apply only in excess of all
"underlying insurance"; and only after all "underlying insurance" has
been exhausted by payment of the limits of such insurance.

The amount we will pay is limited as described in section II. B. and
section III. LIMITS OF INSURANCE.

The definitions, terms, conditions, limitations, exclusions and
warranties contained in the "underlying insurance" polic(ies) that are in
effect at the inception date of this policy apply to this policy unless they
are inconsistent with provisions of this policy, or relate to premium,
subrogation, other insurance, an obligation to investigate or defend, the
amount or limits of insurance, payment of expenses, cancellation or any
renewal agreement.

If any "underlying insurance" does not pay a loss, for reasons other than
exhaustion of an aggregate limit of insurance, then we will not pay such
loss.
. . .
IV. DEFINITIONS

15

A. "Ultimate net loss" means all sums actually paid or which an "insured" is legally obligated to pay, as damages in settlement or satisfaction of claims or "suits" for which insurance is afforded under this policy, after proper deduction for all recoveries, or salvage.

The language of this insurance contract is clear. As the district court noted, the Excess Policy provides that the excess insurer "will pay on behalf of any insured those sums in excess of all underlying insurance that the insured becomes legally obligated to pay as damages after the primary policy of insurance has been exhausted." Under the Excess Policy's express terms, Interstate contracted to provide coverage for the insured's "ultimate net loss" arising from an injury, damage or offense committed during the Policy period that "is insured by 'underlying insurance' designated in the Schedule of Underlying Insurance in ITEM SIX of the Declarations." The Primary Policy is the designated underlying insurance. The loss occurred during the Policy period and was "insured by the underlying insurance." Once Interstate was equitably estopped from disclaiming coverage under the Primary Policy (because of its untimely reservation of rights), the entire judgment in the Lompe action became "sums . . . which an 'insured' is legally obligated to pay, as damages in settlement or satisfaction of claims or 'suits' for which insurance is afforded under this policy." Thus, the full Lompe judgment fell within the Excess Policy's unambiguous definition of "ultimate net loss" to be covered by the Excess Policy when the Primary Policy was "exhausted by payment of the limits of such

16

insurance."[10]  The district court did not rely on any purported duty to defend as an excess insurer to impose excess insurance liability on Interstate, but instead determined that the terms of the Excess Policy had been met when the Primary Policy limits were exhausted.[11]  We see no error in this determination under the circumstances of this case.

Finally, Interstate attempts to rely upon the "follows form" provision of the contract to incorporate the Primary Policy's punitive damages exclusion into the Excess Policy because that exclusion was "in effect at the inception date of th[e Excess] policy."  However, this "follows form" provision explicitly states that the underlying policy's exclusions apply to the Excess Policy "unless they are inconsistent with provisions of this policy."  See also Ostrager & Newman, Handbook on Insurance Coverage Disputes, § 13.01 (18th Ed. 2016) ("It is well settled that the obligations of the following form excess insurers are defined by the

---

[10] Supporting this conclusion is the additional language in the Excess Policy that "[i]f any 'underlying insurance' does not pay a loss, for reasons other than exhaustion of an aggregate limit of insurance, then we will not pay such loss."  Here, the reason for the non-payment of the portion of the Lompe judgment in excess of $1 million was exhaustion of the Primary Policy's aggregate limit of insurance, not the punitive damages exclusion.  In this case there was only one occurrence, resulting in both the occurrence and aggregate limits being met when the $1 million per occurrence limit in the Primary Policy was exceeded.

[11] Its July 2018 order was clear: "The Court finds and concludes that Interstate under the Primary Policy must provide coverage and indemnification, having failed to defend with a timely reservation of rights, for all sums the insureds are legally obligated to pay, which encompasses compensatory and punitive damages.  If policy limits under the Primary Policy are exhausted, the excess insurers' obligations are triggered under the applicable 'follow form' policies and the excess insurers must provide the agreed-upon excess liability coverage."

language of the underlying policies, except to the extent that there is a conflict between the two policies, in which case, absent excess policy language to the contrary, the wording of the excess policy will control."); 4 New Appleman on Insurance Law Library Edition § 24.02 (2020) ("In the uncommon situation in which the language of a primary policy and a following form excess policy differ, the terms of the excess policy control where the excess coverage is implicated."). Allowing a retrograde application of the Primary Policy's punitive damages exclusion to cancel the clear coverage obligations of the Excess Policy to pay AMC's "ultimate net loss" above the Primary Policy's aggregate limit would be inconsistent with the provisions of the Excess Policy that explicitly agreed to provide such coverage. Therefore, Interstate must indemnify AMC under the Excess Policy for the portion of the Lompe judgment in excess of the payment limit of the Primary Policy.

## IV

**AFFIRMED**.

Entered for the Court

Carlos F. Lucero
Circuit Judge

18